The PEOPLE of The State of
Colorado, Complainant,

v.

Ronald L. RUDMAN, Attorney–
Respondent.

No. 96SA466.

Supreme Court of Colorado,
En Banc.

Dec. 8, 1997.

Linda Donnelly, Disciplinary Counsel, James C. Coyle, Assistant Disciplinary Counsel, Denver, for Complainant.

Burns, Figa & Will, P.C., Phillip S. Figa, Alexander R. Rothrock, Englewood, for Attorney–Respondent.

PER CURIAM.

The respondent in this attorney discipline case acted as the personal representative of an estate. In that capacity, he actively misrepresented to the sole beneficiary of the estate the disposition of certain of the decedent's assets, and the respondent's own and his wife's interests in a corporation of which the decedent was a shareholder before his death. A hearing board recommended that the respondent be suspended from the practice of law for two years and six months, and be required to take and pass the Multi–State Professional Responsibility Examination (MPRE). A hearing panel of the supreme court grievance committee generally approved the board's findings and conclusions, but modified the period of suspension recommended to three years. We accept the hearing panel's recommendation.

I.

The respondent was first licensed to practice law in this state in 1978. The evidence at the hearing encompassed an amended stipulation between the parties and the testimony of various witnesses, including the respondent. Following the hearing, the board made the following findings by clear and convincing evidence.

## A. The Bearer Bonds (Count I)

On December 19, 1984, Gerhard John Peter committed suicide. The respondent was a former business associate of Peter, and his law firm had performed services for Peter and his companies. The decedent's mother, Theresia Peter, was born in Austria in 1913. She moved to this country in 1949 and lived in Pennsylvania at the time of her son's death. Although Ms. Peter had previously spoken with the respondent on the telephone, she met the respondent in person for the first time at her son's memorial service.

On December 24, 1984, the respondent was appointed personal representative of the estate of Gerhard John Peter. Ms. Peter believed, throughout the period of respondent's service as personal representative, that her son had been murdered; the police, however, considered the death to be a clear suicide.

Gerhard John Peter had purchased approximately $65,000 in bearer bonds, which were freely negotiable by anyone holding the bonds. Some of the bearer bonds were used by the decedent as collateral for the purchase of an automobile, leaving a balance of about $36,000 in bonds. Ms. Peter was aware of the bonds because her son told her about them in November 1984.

In March 1986, an employee at the respondent's law firm prepared an inventory of the estate. Ms. Peter, who was the sole beneficiary of the estate, reviewed the inventory, and on April 8, 1986, she asked the respondent why the bearer bonds were not on the inventory. The respondent told her that he did not have any knowledge or information about the bonds, but that he would look into it. The board found that the respondent told Ms. Peter that he was not aware that her son had bought any bearer bonds, and he expressed doubt that Peter would have done so because of the small amount of interest the bonds paid. These statements were lies.

In fact, the respondent had received the bearer bonds from Gerhard John Peter. Over a year before, in February 1985, he had sold the bonds and pocketed the proceeds. The board concluded that the respondent's misrepresentations to Ms. Peter were blatantly deceptive and designed to hide from the beneficiary of the estate that he had sold the bonds and placed the proceeds in a joint account held by the respondent and his wife, Martha Hughen Rudman. He did not tell Ms. Peter about his acquisition and sale of the bearer bonds until June 1988, although the respondent and Ms. Peter had various discussions during this two-year time period.

In the summer and fall of 1986, the respondent directed a paralegal at his law firm to find the bearer bonds. He did not inform the paralegal, however, that any investigation would be a charade since the respondent knew exactly what happened to the bonds. The respondent subsequently billed the estate about $1,920 for the pointless search. In addition, the respondent charged, and collected, a total of approximately $32,000 between December 1984 and February 1991, for his services as the personal representative.

On October 23, 1986, the respondent wrote a letter to Ms. Peter about his fictitious efforts to determine the identity of the bondholder. Copies of this letter were sent to a lawyer representing Ms. Peter, and a lawyer representing the estate. Neither of these attorneys knew that the respondent was actively misrepresenting the status of the bearer bonds to the estate's beneficiary. On the same day, the respondent filed a verified statement as the personal representative closing the administration of the probate case involving the Peter estate. A copy of this verified motion was served on Ms. Peter's lawyer. Nevertheless, the paralegal at the respondent's office continued the investigation into the location of the bonds. In the spring of 1987, the paralegal discovered exactly what had happened to the bonds and he confronted the respondent with his discovery.

On November 24, 1986, Ms. Peter wrote to the respondent stating that the estate had to remain open. She wanted the estate to stay open at least until the bearer bonds were accounted for. The hearing board found that given the circumstances the respondent had a fiduciary duty to keep the estate open. Ms. Peter again wrote the respondent in February 1987 about the bonds. She asked the respondent to send her information about the identity of the individuals or entities collecting interest on the bearer bonds. Ms. Peter got this idea from the respondent him-

self, since he had told her previously that he could obtain such information. The hearing board concluded that the respondent's representations about the interest on the bonds contributed to the pattern of deceit.

In the fall of 1987, Ms. Peter retained another lawyer, Stuart N. Bennett, to represent her in matters involving her son's estate. On January 29, 1988, the respondent filed a motion to discharge the fiduciary (himself) in the probate case. In March 1988, Ms. Peter filed a petition to reopen her son's estate, having previously objected to the discharge of the respondent as personal representative. On March 29, 1988, the respondent sent a letter to Bennett. In this letter, the respondent spent more than two pages of single-spaced typewritten text explaining his efforts to locate the bearer bonds, even though the respondent's paralegal had already discovered the previous year that it was the respondent who had taken the bonds. The hearing board found that this letter purported to detail a so-called investigation that was in fact a sham undertaken by the respondent to deceive the beneficiary of the estate. Moreover, in a May 10, 1988, telephone conversation with Bennett, the respondent told Bennett that although he had tried to investigate the location of the bearer bonds he had been unable to locate them.

Finally, the respondent was faced with having to respond, in a court document, to Ms. Peter's motion to reopen and her objections to his discharge as fiduciary. Thus, in June 1988 the respondent admitted to Bennett that he had received the bonds himself, but had not disclosed that fact to Ms. Peter. He told Bennett that he had lied to Ms. Peter because she was not dealing well with her son's death. On July 20, 1988, the respondent filed a response to Ms. Peter's petition to reopen, and he discussed this new disclosure: "With respect to the other bearer bonds which were not pledged ... as collateral, these bonds were transferred to [me] prior to Mr. Peter's death in payment of an obligation owed by Mr. Peter to [me]." The response continued, "Since the transfer of such bonds to [me] were as payment in full of a preexisting obligation owed to [me], the Estate did not sustain any loss as a result of such transfer." The respondent expressed his deep remorse for having lied to Ms. Peter

and to others for over two years in the following way:

> Moreover, [the respondent] regrets *having created any misunderstandings in Mrs. Peter's mind* as to the nature of the disposition of such bearer bonds at any time during his administration of the Estate. Nevertheless, the fact remains that the disposition of the bonds represented payment of a preexisting debt of Mr. Peter prior to his death and does not represent a loss to the Estate.

(Emphasis added.)

A surcharge action was brought against the respondent in March 1989. In December 1989, the respondent refunded the $1,920 that he had billed the estate for his bogus investigation of the bearer bonds. The parties ultimately settled the action with the respondent agreeing to pay $1,000,000. Only a part of this amount had been paid as of the hearing in this case.

The hearing board concluded that the respondent breached his fiduciary duty as the personal representative of the estate. The board summarized its findings as follows:

> The board determined that there are no credible explanations for the respondent's conduct in actively misrepresenting to Mrs. Peter and two attorneys, during a period of more than two years, that he did not have bearer bonds that he had obtained from Mr. Peter shortly before Mr. Peter's suicide. Similarly, the board found there are no credible explanations for the respondent's conduct in concocting a scheme involving innocent third parties (the respondent's own office personnel including ... a legal assistant in the respondent's office) to find the very bearer bonds that had been in the respondent's possession and used by him for his own benefit. The board therefore finds that the respondent had a dishonest, or at least selfish, motive in conducting himself as he did in regard to the bearer bonds.

The hearing board found that the respondent's conduct, which occurred before the effective date of the Rules of Professional Conduct, January 1, 1993, violated following provisions of the former Code of Professional Responsibility: DR 1–102(A)(4) (engaging in

conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1–102(A)(5) (engaging in conduct prejudicial to the administration of justice); and DR 1–102(A)(6) (engaging in conduct that adversely reflects on the lawyer's fitness to practice law); as well as C.R.C.P. 241.6(3) (violating the highest standards of honesty, justice or morality is grounds for discipline).[1]

### B. The Hammer Technologies Stock (Count II)

At the time of his death, Gerhard John Peter owned stock certificates in Hammer Technologies, Inc. Of the almost 18,000,000 shares issued by Hammer, Peter held 415,000 restricted shares which could not be sold for two years after Peter received them or until after August 1985.[2] He also held 149,500 unrestricted shares which could be sold at any time.

On September 16, 1985, James C. Bull, a lawyer, filed a general appearance on behalf of Ms. Peter in the probate case. He represented her on a contingent fee basis with respect to a claim filed by a woman claiming to be the common-law wife of the decedent. The putative spouse claim was settled and dismissed in March 1986.

In either February or March 1986, the respondent stated that the Hammer stock was becoming fully priced. He conferred with his lawyer, the lawyer for the estate, regarding the sale of the Hammer stock held by the estate. During this conference, the respondent telephoned Bull. The respondent's lawyer asked Bull what Ms. Peter wished to do regarding the sale of the stock. Bull suggested that the parties meet and discuss it. Ms. Peter, Bull, and the respondent met on April 8, 1986 to discuss the sale.

Before this meeting, sometime in March 1986, Bull asked the respondent if he owned any Hammer shares, and the respondent said no. The respondent also told Bennett, Ms.

Peter's other lawyer, that during the time period of March or April 1986, neither the respondent nor his wife had bought or sold any Hammer stock. The hearing board concluded that the respondent's wife, Martha Hughen Rudman, had sold Hammer stock during that time period, and the respondent had owned Hammer shares. The respondent therefore made misrepresentations to both Bull and Bennett.

At the April 8 meeting, the respondent stated that on or about March 19, 1986, he placed 100,000 of the estate's Hammer shares for sale and would place the additional shares for sale once these were sold. Bull sent the respondent a letter on April 11 to confirm that Ms. Peter wanted all of the securities in the estate sold in the "current market" with the exception of 500 shares of Hammer stock to be retained for sentimental reasons.

In a letter on April 15, the respondent told Bull that he had filed a Form 144 to sell 100,000 shares of Hammer stock and that he would file another Form 144 to sell the balance as soon as the initial batch was sold. He also stated that it would take approximately 90 to 120 days to liquidate all of the shares. The form filed for the proposed sale of the 100,000 shares listed their aggregate value as $700,000. Although under SEC Rule 144 (see footnote 1 above), the entire block of 415,000 shares could have been sold, the respondent did not do so. Ms. Peter's lawyer did not object to the information in the respondent's April 15 letter relating to the time in which the Hammer shares would be sold.

Between December 24, 1985, and April 17, 1986, the respondent had sold 149,500 Hammer shares on behalf of the estate in bundles of 3,500 to 50,000 shares, for a total of $357,496.64. At the close of business on April 18, 1986, Hammer shares were selling for $14 a

---

**1.** Finding that Ms. Peter was not the respondent's client, and that the respondent did not "represent" any interests adverse to the estate (although his own interests conflicted with his obligations as the personal representative), the hearing board concluded that the respondent had not violated DR 5–101(A) (accepting employment if the exercise of the lawyer's professional judgment on behalf of the *client* will be or reasonably

may be affected by the lawyer's own financial, business, property, or personal interests). The complainant has not excepted to this ruling.

**2.** "S.E.C. Rule 144 generally restricts the transferability of unregistered stock for a two year period. *See* 17 C.F.R. § 230.144 (1987)." *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 413 n. 5 (8th Cir.1988).

share. Following the publication of a negative magazine article about Hammer, however, the price of Hammer shares fell. At close of business on April 21, they were selling for $5 a share. After April 28 the price was less than $1 a share. It now appears that the market for Hammer shares was large enough to have allowed the estate to sell all of the Hammer shares at one time without materially affecting the market price.

During 1985 and 1986, the respondent was securities counsel for Hammer. James C. Bull, Ms. Peter's lawyer, was aware of this relationship no later than December 1985. The respondent's law firm was responsible for issuing SEC Rule 144 opinion letters regarding the transfer of restricted Hammer stock. Although the letters were in fact prepared by associates, or even paralegals, at the respondent's firm, he himself signed many of the letters.

Back in 1983, 415,000 shares of Hammer stock were issued to TMI Company, a sole proprietorship operated by the respondent's wife Martha Hughen Rudman. "TMI" stands for "Three Meaningless Initials." In January 1986, TMI placed 175,000 of these Hammer shares for sale by "M.C. Hughen." "M.C. Hughen" is the respondent's wife. The last of these shares were sold on March 20, 1986, and TMI made a substantial profit from the sale. The sale of these Hammer shares did not have a material effect on the market price.

The hearing board found clear and convincing evidence to support the proposition that the respondent failed to provide full disclosure to Ms. Peter that his wife's business held Hammer shares, and that this was a misrepresentation. The respondent therefore violated DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and DR 1–102(A)(6) (engaging in conduct that adversely reflects on the lawyer's fitness to practice law).

## II.

■ The hearing panel modified the board's recommendation of a suspension for two years and six months to a three-year suspension. The respondent has filed exceptions and asserts that suspension for a one year and one day is adequate. The complainant favors disbarment.

Under the ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) (ABA *Standards*), in the absence of mitigating factors, disbarment is generally appropriate when "a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that adversely reflects on the lawyer's fitness to practice." ABA *Standards* 5.11(b). We agree with the hearing board that the respondent's intentional pattern of lies to Ms. Peter, who as the sole beneficiary of the estate stood in a fiduciary relation with the respondent even if she was not his client, adversely reflects on the respondent's fitness to practice law. In the absence of mitigating circumstances, we would disbar the respondent.

The respondent's exceptions relate to the board's finding of misconduct with respect to the Count II, involving the Hammer shares, and the board's alleged improper discounting of certain mitigating factors, such as the presence of remorse. As to Count II, paragraph 43 of the formal complaint provides:

Respondent failed to sell the Hammer shares after he perceived the shares to be reaching their maximum price; failed to properly advise Mrs. Peter of the provisions of SEC Rule 144; *engaged in dishonest conduct by failing to advise Mrs. Peter that his wife's business also held Hammer shares* and by failing to provide full disclosure to Mrs. Peter concerning his employment with Hammer, and by selling estate shares only after respondent had sold all of TMI's shares; and engaged in conflicting multiple employment by serving the estate as personal representative and serving Hammer as securities counsel.

(Emphasis added.) Paragraph 41 of the hearing board's findings states:

Mrs. Peter and Mr. Bull met with respondent on April 8, 1986, to discuss the sale. The board determined that prior to the April 8, 1986 meeting and sometime in March, 1989, Mr. Bull asked the respondent if the respondent owned any Hammer shares. The respondent denied owning any Hammer shares. The board further found that the respondent told Mr. Bennett (Mrs. Peter's other attorney) that during the time period of March or April,

1986, neither the respondent nor his wife had engaged in any transactions of Hammer stock. It was the board's finding that in fact, Mrs. Rudman, the respondent's wife, had sold Hammer stock in that time period, and the respondent had owned Hammer shares. The board thus determined that the respondent made misrepresentations regarding the ownership of and transactions in Hammer shares to both Mr. Bull and Mr. Bennett.

(Record citations omitted.) The hearing board concluded that the respondent failed to provide full disclosure to Ms. Peter that his wife's business held Hammer shares, and that this was a misrepresentation. The respondent complains that the "evidence supporting such misconduct is materially different from the misconduct alleged in Count II and was never pled as an independent alleged violation." The argument is that the complaint does not charge the respondent with falsely denying that *he* owned Hammer stock, or with falsely denying that he and his wife had engaged in transactions involving Hammer stock. The complaint charged the respondent with denying that his wife *owned* Hammer shares, not with denying that she traded them. This is a technical point, but even assuming the hearing board found that the respondent had engaged in misconduct that was not literally charged in the complaint, any error is harmless.

The level of discipline in this case is governed by the misconduct found in Count I because it is more serious than the misconduct involving the Hammer shares. We have already determined that this conduct, by itself, may well deserve disbarment.

The hearing board found the following factors in mitigation: the absence of a prior disciplinary record, *see id.* at 9.32(a); a cooperative attitude toward the proceedings, *see id.* at 9.32(e); and evidence of good character or reputation, *see id.* at 9.32(g).

We do not think that the hearing board erred in finding that the respondent was not entitled to the benefit of the mitigating factor of remorse. While the respondent *expressed* remorse about the bearer bonds, he steadfastly refused to see any misconduct whatsoever with respect to the Hammer shares. The hearing board observed the respondent

testify and they performed their duty to determine the credibility of his testimony.

▆▆▆▆ "When approved by the hearing panel, the board's factual findings are binding on this court unless, after considering the record as a whole, the findings are unsupported by substantial evidence." *People v. Bennett,* 810 P.2d 661, 665 (Colo.1991). "When, as here, it acts as fact-finder, the hearing board has the duty to assess the credibility of the evidence before it, controverted and uncontroverted." *People v. Robnett,* 859 P.2d 872, 877 (Colo.1993). "In determining whether the board's findings are supported by substantial evidence, it is not within the province of this court to measure the weight of the evidence or to resolve the credibility of witnesses." *People v. Distel,* 759 P.2d 654, 662 (Colo.1988).

The hearing board also found that the respondent's explanations of why he lied to Ms. Peter about the bonds (to save her from additional turmoil because she was not dealing well with her son's death) were not credible. This is consistent with the board's finding that the respondent was not remorseful to the extent warranting mitigation of the sanction. The record amply supports the board's conclusion that the respondent in fact felt no real remorse for his serious misconduct. The respondent makes much of his ultimate revelation to his own lawyer, and Ms. Peter's lawyer, of his deception. He indicates that when he was faced with the necessity of committing perjury if he continued with the deceit, his principles finally surfaced.

When he had no choice, the respondent realized that he had to confess or risk imprisonment for perjury. Such a weak demonstration of remorse is not a mitigating factor.

Like the hearing panel, however, we find that the following mitigating factors, particularly the fact that the respondent has not been previously disciplined, and the fact that there have been no additional charges of misconduct against the respondent, are sufficient to call for a sanction less than disbarment. However, two members of the court would disbar the respondent. Accordingly, we accept the hearing panel's recommendation that the respondent be suspended for

three years and be required to pass the MPRE as a condition for reinstatement.

### III.

It is hereby ordered that Ronald L. Rudman be suspended from the practice of law for three years, effective thirty days after this opinion is released. The respondent in ordered to take and pass the Multi–State Professional Responsibility Examination as a condition of reinstatement. The respondent is also ordered to pay the costs of this proceeding in the amount of $14,965.21 within ninety days after the announcement of this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Denver, Colorado 80202. The respondent shall not be reinstated until he has complied with C.R.C.P. 241.22(b)–(d).