The PEOPLE of the State of Colorado, Complainant,

v.

Daniel Evan BRONSTEIN, Attorney–Respondent.

No. 98SA121.

Supreme Court of Colorado, En Banc.

Aug. 31, 1998.

Linda Donnelly, Disciplinary Counsel, John S. Gleason, Deputy Disciplinary Counsel, Denver, for Complainant.

Phillip S. Figa, Burns, Figa & Will, P.C., Englewood, for Attorney–Respondent.

PER CURIAM.

The respondent in this lawyer discipline case, Daniel Evan Bronstein, retained attorney fees he received from clients that rightfully belonged to his law firm. A hearing panel of the supreme court grievance committee approved the findings and recommendation of a hearing board that Bronstein be suspended from the practice of law for one year and one day. We accept the panel's recommendation.

### I.

Bronstein was admitted to practice law in this state in 1990. Two formal complaints, Nos. GC95A–76 and GC97A–33, are involved in this case. The parties submitted an unconditional stipulation of facts to the hearing board. Based on the stipulation and the evidence presented, the board made the following findings by clear and convincing evidence.

#### A. No. GC95A–76

In April 1994, Bronstein resigned from the law firm of Dill, Dill, Carr, Stonbraker & Hutchings, P.C. (Dill & Dill). He was hired by the law firm of Cook & Lee, P.C. (Cook & Lee). Bronstein's base salary at Dill & Dill was $42,000 plus bonuses. His gross income

during his last year at Dill & Dill was about $68,000.

Bronstein brought some criminal and domestic cases with him when he started at Cook & Lee. Both Dill & Dill and Cook & Lee agreed to allow Bronstein to handle the cases he took with him. Although there was no written agreement with Cook & Lee regarding the cases he brought, the parties understood that all fees paid by the clients in those cases would go to Cook & Lee and not to Bronstein individually. He was paid by Cook & Lee on a straight annual salary of $42,000, in addition to potential bonuses as cases settled.

Shortly after starting work, Bronstein told Cook & Lee's office receptionist that he would open his own mail. He advised the file clerk that he would do his own filing. In August 1994, the receptionist opened an envelope addressed to Cook & Lee from Mile High Flea Market, one of the clients Bronstein had brought with him from Dill & Dill. A check for $1,700 was enclosed, made payable to "Cook & Lee, P.C." The bookkeeper made a copy of the check and left the original in Bronstein's box.

When Bronstein did not return the check to the bookkeeper for several weeks, she informed Cook & Lee. She also told them that Bronstein had only given her the first month's billing slips or statements for the cases he had brought to the firm, and none thereafter. Bronstein generated his own billing because the firm limited itself to taking contingent fee cases and did not send monthly billings to their clients.

When Lee questioned Bronstein about the $1,700 check, he said he did not remember seeing the check and did not know what had happened to it, but he would look into it. Later, the firm learned that Bronstein had taken the original check to Mile High and asked them to type in his name as an additional payee. He then endorsed the check and deposited it into his personal account.

A few days later, Bronstein turned over a certified check to Cook & Lee in the amount of $1,700. He claimed Mile High had reissued the check at his request. In fact, Mile High was unaware of the new check.

In December 1994, another client tendered a check for $1,000 made payable to Bronstein as an advance fee in a criminal matter. The receptionist made a copy of the check and put the original in Bronstein's box. Several weeks passed, and the check was not turned over to the bookkeeper for deposit.

At this point, Cook initiated an investigation. He discovered that the original $1,700 check from Mile High had Bronstein's name typed above "Cook & Lee, P.C." as payee. He also saw that the check had been endorsed by Bronstein and was deposited in his personal checking account. When he reviewed some of the files that Bronstein had brought with him, he learned that Bronstein had been billing and receiving fees on his own and not reporting the fees to the firm. In all but one of the cases, the Quigley case, Bronstein billed on an hourly basis.

On January 16, 1995, the partners confronted Bronstein with the $1,700 check from Mile High. Bronstein admitted depositing the check into his personal account, but denied altering it. When shown the copy of original check the bookkeeper had made, he stated that he had requested the client to type his name on the check. Bronstein also admitted that he had kept fees in other cases billed on an hourly basis. The next day, Bronstein handed Cook a list of fee receipts totaling approximately $12,000 that he had not turned over to the law firm. He gave Cook a check made payable to the firm for $12,000. Bronstein also submitted his resignation, effective immediately. He was allowed to take some cases with him. Bronstein later gave Cook & Lee additional funds that he discovered he owed the firm for cases he had handled and billed while employed by the firm.

Bronstein stipulated, and the hearing board found, that the foregoing conduct violated Colo. RPC 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and Colo. RPC 8.4(h) (engaging in conduct adversely reflecting on the fitness to practice law).

### B. No. 97A–33

When Bronstein brought clients with him from Dill & Dill, the agreement with Cook &

Lee provided that Bronstein's new firm would pay Dill & Dill a portion of the attorney fees paid to them by the transferred clients, depending on the amount of work done by Bronstein at Dill & Dill. This arrangement was reduced to a written agreement between Bronstein and Dill & Dill on April 25, 1994.

Several months after Bronstein resigned from Cook & Lee, Dill & Dill made a demand on Cook & Lee for attorney fees arising from cases that had been transferred to Cook & Lee and which remained with them after Bronstein's termination. On October 22, 1996, Dill & Dill notified Cook & Lee that their former client, Joe Quigley, had paid Bronstein $3,000 "under the table" the previous November. They demanded 80% of the $3,000, pursuant to their agreement with Bronstein. Cook & Lee paid this amount after Bronstein told them that the $3,000 was included in the $12,000 payment he had made in January 1995.

During the investigation of this case by the Office of Disciplinary Counsel, Bronstein told the investigative counsel that the $3,000 payment was a bonus, in addition to actual fees. Although he knew it was not a bonus, Bronstein now claims that he intended ultimately to reimburse Cook & Lee in that amount once work on all of the Quigley projects was completed. In any event, Bronstein admits that his conduct in the Quigley matter violated Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation); and Colo. RPC 8.4(h) (conduct adversely reflecting on the fitness to practice law). In addition, he has stipulated that he did not comply with Chapter 23.3 of the Colorado Rules of Civil Procedure, "Rules Governing Contingent Fees," because he failed to advise Quigley of the nature of other types of possible fee arrangements and did not reduce the contingent fee agreement to writing.

## II.

At the hearing, the parties asserted that a suspension for a year and a day was appropriate for Bronstein's misconduct, and the board agreed. Under the ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) (ABA *Standards* ), in the absence of mitigating factors, disbarment is generally appropriate when "a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that adversely reflects on the lawyer's fitness to practice." ABA *Standards* 5.11(b). *See also id.* at 7.1 ("Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal profession."). On the other hand, in the absence of aggravating or mitigating factors, "[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system." *Id.* at 7.2.

As an aggravating factor, the board found that Bronstein had a dishonest or selfish motive at the time of the misconduct. *See id.* at 9.22(b). In particular, the board made the following observation:

> The respondent, in his stipulation and in his testimony before the board, acknowledges his misconduct. He claims that he acted out of a sense of frustration because he began his employment at Cook & Lee expecting to make as much or more as he made at Dill & Dill. The firm's failure to pay him bonuses, coupled with his commute from Denver to the Boulder law firm, created personal financial problems. He felt that the firm had let him down. During the time he kept client fees, he rationalized that the money would not have gone to the firm but for the fact that the cases came with the respondent when he transferred to [sic] Dill & Dill.

The board was thus concerned that even at the time of the hearing, Bronstein sought to minimize his dishonesty with excuses that only serve to underscore his own lack of judgment and maturity.

On the other hand, in mitigation, the board found that Bronstein has no prior disciplinary record, *see id.* at 9.32(a); he made a timely good faith effort to make restitution to the firm, *see id* at 9.32(d); other penalties or

sanctions have been imposed on him, *see id.* at 9.32(k); and he has expressed remorse, *see id.* at 9.32(*l*). As the board determined, while Bronstein's lack of legal experience may tend to mitigate some of the misconduct in the Quigley matter, it is not relevant to his dishonest and deceitful conduct in the overall fee disposition issue.[1]

The lawyer in *People v. Guyerson*, 898 P.2d 1062, 1062 (Colo.1995), falsified requests to his law firm for advances for travel and expenses that did not occur. He also submitted fictitious requests for reimbursement of firm-related expenses. *See id.* Guyerson improperly billed the law firm, and received, $13,500; in addition, four or five of his clients were billed and paid for these fraudulent expenses. However, we pointed out that "[e]ven if the respondent had been entirely successful in stealing only from his law firm and from his partners, we would not find it particularly significant for disciplinary purposes. The respondent did intend to steal from his partners." *Id.* at 1063. We disbarred Guyerson despite the absence of previous discipline. *See id.* at 1063–64.

In *People v. Rudman*, 948 P.2d 1022 (Colo. 1997), Rudman intentionally misrepresented to the sole beneficiary of an estate and others over a two-year period that he did not know what had happened to certain bearer bonds that the beneficiary believed were assets of the estate. *See id.* at 1023–24. In fact, Rudman had negotiated the bonds and pocketed the proceeds, although there was no finding that he had misappropriated the funds. *See id.* at 1023. Rudman was suspended for three years. *See id.* at 1027–28. Based on the stipulation and the board's findings, Bronstein's misconduct · was not quite as serious as that in *Guyerson* and *Rudman.*

We suspended the lawyer in *People v. Reed*, 942 P.2d 1204, 1205–06 (Colo.1997), for a year and a day for his failure to disclose to judgment creditors that he had received substantial sums of money from his law firm, and for improperly transferring various purported ownership interests to the lawyer employees of his firm. As in this case, we cited and discussed the applicability of ABA *Standards* 5.11(b) and 7.2. *See* 942 P.2d at 1205.

Considering the seriousness of the misconduct together with the mitigating factors, we agree that suspension for one year and one day is appropriate, although at least one member of the court would have imposed a greater sanction. Accordingly, we accept the recommendations of the hearing panel and hearing board.

## III.

Accordingly, it is hereby ordered that Daniel Evan Bronstein be suspended from the practice of law for one year and one day, effective thirty days after the issuance of this opinion. It is further ordered that Bronstein pay the costs of this proceeding in the amount of $546.66 within thirty days after the announcement of this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Denver, Colorado 80202.

---

1. Although the parties stipulated that certain additional mitigating factors were present, e.g., personal or emotional problems, the board declined to recognize these factors. Neither of the parties has excepted to the board's action.