The **PEOPLE** of the State of Colorado, Complainant

v.

**Ligita S. BARDULIS, Respondent.**

No. 07PDJ012.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

March 13, 2008.

On January 8–10, 2008, a Hearing Board composed of E. STEVEN EZELL and JOHN M. LEBSACK, both members of the Bar, and WILLIAM R. LUCERO, the Presiding Disciplinary Judge ("PDJ"), held a hearing pursuant to C.R.C.P. 251.18. MARGARET B. FUNK and JULIE M. SCHMIDT appeared on behalf of the Office of Attorney Regulation Counsel ("the People"). NORMAN R. MUELLER appeared on behalf of LIGITA S. BARDULIS ("Respondent"). The Hearing Board issues the following Opinion and Order Imposing Sanctions Pursuant to C.R.C.P. 251.19.

## OPINION AND ORDER IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19

### I. *ISSUE*

Disbarment, absent substantial mitigation, is generally appropriate when a lawyer

knowingly converts funds. Respondent, an employee of a law firm, kept fees she collected instead of submitting them to the firm as provided in her employment agreement. She engaged in this conduct without authorization and without disclosing it to the firm. She later made false statements to the firm and to the People with regard to her conduct. Did Respondent violate Colo. RPC 8.4(c)?

The Hearing Board finds clear and convincing evidence that Respondent violated Colo. RPC 8.4(c) as charged in Claims I and II of the Complaint. Specifically, Respondent knowingly converted funds belonging to Powers Phillips, P.C. ("the firm") when she, unilaterally, without authorization, and without providing notice to anyone at the firm, deposited fees she collected as an employee of the firm into a COLTAF account she had established for her own use and benefit. Further, Respondent knowingly acted dishonestly when she told shareholders of the firm that she had not collected any fees in July, August, and September 2005. Finally, Respondent knowingly acted dishonestly when she repeated this assertion to the People during the course of their investigation. **SANCTION IMPOSED: ATTORNEY DISBARRED.**

## II. *PROCEDURAL HISTORY AND BACKGROUND*

On February 16, 2007, the People filed their Complaint in this matter and Respondent filed her Answer on April 19, 2007. The Complaint contains three claims for relief. The PDJ granted a motion for summary judgment as to the third claim dealing with improperly advancing financial assistance to a client in violation of Colo. RPC 1.8(e) on December 21, 2007.

The first and second claims charge separate violations of Colo. RPC 8.4(c). Claim I is based upon Respondent's alleged knowing conversion in failing to remit fees she earned to Powers Phillips, P.C. Claim II is based upon Respondent's alleged false statements to the firm and later to the People when they began their investigation concerning her contention that she had not collected any fees in

July, August, and September, which alleged false statements would be in violation of Colo. RPC 8.4(c). At the conclusion of the evidence, the People argued that Respondent should be disbarred based upon Colorado case law and ABA *Standards,* which presumptively call for disbarment when a lawyer knowingly converts funds belonging to another, or engages in other conduct involving dishonesty, fraud, deceit or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice. *See* ABA *Standards* 4.11 and 5.11(b).

Respondent argued that the People failed to establish clear and convincing evidence that she knowingly took firm property or funds. Respondent testified that she never intended to steal from the firm nor act dishonestly in telling the firm or the People that she had not collected fees in July, August, and September. She believed that she was no longer an employee of the firm, but rather a subtenant of the firm based upon oral approval from two members of the firm. Respondent therefore argues the People cannot prove a knowing conversion, and at most, a public censure is the appropriate sanction under ABA *Standards* 5.13 should the Hearing Board find a violation of Claim II.

## III. *FINDINGS OF MATERIAL FACT*

The Hearing Board considered the testimony of each witness and exhibit admitted into evidence, and finds the following material facts established by clear and convincing evidence.[1]

### *Background*

Respondent has taken and subscribed the Oath of Admission, was admitted to the Bar of the State of Colorado on October 16, 2000, and is registered as an attorney upon the official records of the Colorado Supreme Court, Attorney Registration No. 32027. She is therefore subject to the jurisdiction of the Colorado Supreme Court and the Office of the Presiding Disciplinary Judge in these proceedings. Respondent's business address is Post Office Box 270842, Littleton, Colorado 80127.

---

**1.** The Hearing Board incorporates the Parties' "Stipulation of Facts" into its findings.

Respondent is a practitioner who specializes in workers' compensation and social security law. She was employed with Powers Phillips, P.C., from April 15, 2005, until she was terminated on September 22, 2005. She has practiced as a sole practitioner since that time.

### Respondent Seeks Employment with the Firm

In April 2005, Respondent answered an advertisement placed in the *The Docket* for an employment opportunity at Powers Phillips, P.C. Respondent met with members of the firm and discussed a "transitional shareholder agreement" with them. This arrangement would give Respondent the opportunity to receive a monthly salary and benefits without the necessity of paying the entire amount of monthly overhead paid by a full shareholder at the firm. This arrangement would also give the firm the opportunity to evaluate Respondent's ability to generate income with the hope that she would eventually transition into a full shareholder and thereby reduce the monthly overhead costs for the other shareholders. During the interview process, Respondent provided the firm with records illustrating fees she generated with her employer at that time.[2] The firm likewise provided Respondent with a monthly report illustrating how the firm calculated salaries for shareholders.[3]

Following these preliminary discussions, the firm offered Respondent an employment contract, which required Respondent to practice solely for the firm and for no other lawyer or firm unless she received consent from the firm. Otherwise, Respondent would be obligated to devote her entire professional time to the affairs of the firm. Furthermore, the firm agreed to pay Respondent a salary equal to 50% of the fees she collected minus certain discretionary costs. The firm would apply their 50% share of the collected fees toward overhead costs. Under the terms of the employment agreement, Respondent would never be responsible for any overhead deficiency.[4]

If either Respondent or the firm wanted to terminate the employment agreement, they could do so by providing thirty-day written notice to the other party. Otherwise, the contract would remain in effect from April 2005 through October 2005. Respondent signed this employment agreement.

### Respondent Supplies a List of Clients to the Firm

After commencing employment with the firm, Respondent used the firm's letterhead to advise a client that she was leaving her old firm and "join(ing) a new law firm." Respondent explained that she would be better able to serve the client at her new firm because she would have more resources at her disposal.

Since the firm provided malpractice insurance for Respondent under the terms of the employment contract, the firm administrator asked Respondent for a list of clients.[5] On or about May 25, 2005, Respondent provided the firm with a list of twenty-three clients to place in the firm's computer records.[6] As late as August 1, 2005, Respondent entered into a fee agreement, which identified her as, "Ligita S. Bardulis, of Powers Phillips P.C." [7] Nevertheless, after Respondent started working for the firm, she alone maintained contact with her clients. Firm staff never opened mail addressed to Respondent.

### Respondent Provides Fees to the Firm for Two Months

In April and May of 2005, Respondent submitted to the firm 100% of the fees she

---

2. *See* Parties' Stipulated Exhibit 3.

3. Full shareholders were responsible for a proportional share of the overhead, which included rent, staff, and malpractice insurance. These monthly costs were subtracted from fees generated by the shareholders.

4. *See* Parties' Stipulated Exhibit 1, "Employment Agreement."

5. *See* Parties' Stipulated Exhibit 9, Bates Stamp LB0096.

6. *See* Parties' Stipulated Exhibit 9, Bates Stamp LB0092.

7. *See* Parties' Stipulated Exhibit 7.

collected while representing her clients. After calculating Respondent's salary based upon the agreed upon formula, 50% of fees collected minus discretionary costs, Respondent received a salary of approximately $300.00 in May 2005, and $200.00 in June 2005.[8] The firm issued all checks to Respondent's clients during this time.[9]

After assessing her first two months as an employee at the firm, Respondent began to question some of the charges assessed against her salary and began to feel the firm was taking advantage of her. At the same time, Respondent was experiencing some financial difficulties, including carrying two home mortgages. Respondent therefore asked the firm's office manager to run some numbers so she could determine the actual overhead costs, the amount paid by a full shareholder, and the amount paid by her. The office manager ran the numbers and responded to Respondent via e-mail on July 21, 2005.[10] The office manager also advised Respondent to present any proposed changes to her arrangement at the next firm meeting.

Respondent did not request any changes during the next firm meeting. However, on July 27, 2005, she wrote to the firm shareholders and asked for some "flexibility" due to her financial difficulties.[11] Respondent pointed out that her expenses with the firm exceeded her collections and that she would be interested in an "of counsel" or "subtenant" arrangement with the firm wherein she would pay her own rent subject to the firm's approval.[12] This issue, however, was not addressed until the September 2005 shareholder meeting. At that time, the firm agreed to allow Respondent to become a subtenant under a sublease agreement that would commence on or about October 1, 2005.[13]

### Respondent Fails to Disclose Fees She Collected

In July, August, and September, Respondent withheld from the firm all fees that she had collected from clients.[14] She deposited those fees into her own COLTAF account that she established on July 7, 2005, without the firm's knowledge.[15] Between April and September 2005, the attorney fees checks issued to Respondent's social security clients were often issued separately from the clients' settlement checks and were made payable to Respondent individually. At the same time, Respondent continued to hold herself out as a member of the firm in pleadings and written fee agreements with clients. Respondent did not pay rent in July, August, and September, and members of the firm continued to treat her as a transitional shareholder with the ultimate goal of transitioning her into a full shareholder.

Furthermore, although Respondent entered into a fee agreement with a client as a member of the firm on April 18, 2005, she did not disclose to the firm that she disbursed settlement funds to the client, collected attorney fees of $2,467.78 on or about July 26, 2005, and deposited those fees into her own trust account.[16]

### Respondent Holds Herself Out as a Member of the Firm

While employed at the firm, Respondent filed numerous pleadings and other legal documents, which identified Respondent as a member of the firm.[17] Respondent also sent correspondence on firm letterhead, which identified her as a member of the firm as late

---

8. *See* Parties' Stipulated Exhibit 5, firm salary credits. In May Respondent generated fees of $5,269.78. In June Respondent generated fees of $5,377.57. *See* Parties' Stipulated Exhibit 15 for Respondent's estimate of how much she earned in May and June 2005.

9. *See* Parties' Stipulated Exhibit 29.

10. *See* Parties' Stipulated Exhibit 9.

11. *See* Parties' Stipulated Exhibit 12.

12. *Id.*

13. *See* Parties' Stipulated Exhibit 19.

14. *See* Parties Stipulation of Facts.

15. *Id.*

16. *See* Parties Stipulated Exhibit 30.

17. *See* Parties' Stipulated Exhibits 10, 25, 27, 28, 31, and 34.

as September 7, 2005.[18] Respondent also falsely reported to the firm that she had not collected any fees in July, August, and September 2005. Throughout this time, members of the firm believed that Respondent was abiding by the terms of her employment agreement. The firm was unaware that in late June 2005, Respondent had established her own Limited Liability Company entitled "Ligita S. Bardulis, LLC."

### Members of the Firm Question Respondent's Failure to Report Fees

When Respondent reported no collected fees to the firm in July and August, one of the firm's shareholders, Wendy Weigler, went to Respondent's office to discuss this issue with Respondent. Ms. Weigler and other shareholders felt concerned, because Respondent had not collected fees for two consecutive months. In response to Ms. Weigler's inquires, Respondent stated that the firm should not be concerned, the fees would be forthcoming although they had not yet been realized, and that the nature of Respondent's practice resulted in dry spells at times. Respondent did not, however, indicate that she had created a COLTAF account, an LLC, and transferred client fees to these entities in July and August.

### Respondent is Terminated When the Firm Discovers Respondent's Undisclosed COLTAF Account

On September 21, 2005, a client called the firm and complained that he could not cash a check he had received from Respondent in a social security matter. Upon inquiry of the client, firm personnel discovered that although the client was listed as a firm client, the check he held had not been written on a firm account. Upon further inquiry, the firm discovered Respondent maintained a COLTAF account in her name at Wells Fargo Bank. Respondent admitted that she opened this account on or about July 7, 2005, after

receiving what she believed to be a verbal authorization to change her status from employee to subtenant of the firm.[19] However, in her response to the People's Request for Investigation, Respondent stated that she had established her own LLC and trust account in "anticipation" of becoming a subtenant. She also contended that the firm had initially told her that it would not be a problem to convert to subtenant status, but then the next day firm members told her this could not be done.[20]

On September 22, 2005, immediately following the discovery of Respondent's undisclosed COLTAF account, the firm notified Respondent by letter that her employment with the firm had been terminated. They also asserted that Respondent had breached her employment agreement with the firm by collecting fees on behalf of clients and not submitting them to the firm. In addition, the firm demanded that Respondent pay actual costs incurred on her behalf as an employee under the employment agreement. Finally, they advised Respondent that her conduct in diverting fees could be deemed civil theft, conversion, and possibly fraud.[21] Shortly thereafter, the firm reported Respondent's conduct to the People.

### The People's Investigation

In response to the People's intake lawyer inquiring about the firm's report against her, Respondent claimed that the firm's assertions were "baseless" and that the matter involved nothing more than a dispute between attorneys over expenses in an office sharing arrangement. Respondent therefore resisted the People's request to examine her client files, and in particular, resisted the People's effort to obtain her COLTAF account records.[22] When the People ultimately subpoenaed Respondent's COLTAF account records, they discovered that she had collected fees and some costs from clients in July, August, and September of 2005. The total

---

18. *See* Parties' Stipulated Exhibit 26.

19. *See* Respondent's Trial Brief and Memoranda of Legal Authority, p. 4.

20. *See* Parties' Stipulated Exhibit 13, Bates Stamp C–00142.

21. *See* Parties' Stipulated Exhibit 2.

22. *See* Parties' Stipulated Exhibit 13, Bates Stamp C–00153.

amount she had collected was $10,962.56. Respondent never advised the firm that she had collected these fees and had kept them.

### Testimony on Behalf of Respondent

Respondent testified that she never intended to convert firm funds by withholding fees from them in July, August, and September, but that she believed shareholders Tamara Vincellette and Wendy Weigler had orally agreed she could become a subtenant and that they had released her from the obligation to report fees she collected to the firm. These shareholders testified that they never gave Respondent oral permission to change her status to a subtenant.[23] The Hearing Board finds Respondent did not have a reasonable basis to believe the firm had orally agreed she could become a subtenant. The testimony of Ms. Vincellette and Ms. Weigler on this point is clear and convincing. The firm eventually approved, in writing, her request to become a leaseholder in September 2005, but it would only become effective on October 1, 2005.[24]

Respondent's current practice involves the representation of disabled and indigent persons who would otherwise have a difficult time finding legal representation. Respondent, for the most part, represents poor and disadvantaged persons seeking Social Security disability benefits and workers compensation benefits. Respondent provides legal services to many homeless persons who end up being hospitalized at Denver Health Medical Center of the University Hospital; Respondent often makes initial contact with these clients while they are still in the hospital in an effort to see if they are eligible for disability benefits. In many cases, but for the Respondent's willingness to undertake this work, these clients would not be able to obtain legal representation.

Respondent called a number of witnesses who testified to her legal skill and compassion for her clients. The client who had contacted the firm about the check from Respondent's account was the same client whom Respondent had advanced funds before the arrival of his settlement check. The client was in a desperate financial situation and Respondent provided him money because she felt the ethical breach of Colo. RPC 1.8(e) (prohibition on the advancement of funds) was necessary to avoid the potential harm to her client.

### Psychiatric Testimony

David S. Wahl, a forensic psychiatrist, testified that Respondent did not suffer from a mental disease or a serious personality disorder. He also found no evidence of substance abuse. In his view, Respondent did not act out of malice or intent to harm anyone. However, according to Dr. Wahl, Respondent's experiences dealing with her parents' traumatic history and an abusive husband all made her "exquisite[ly] sensitive to injustices." In explaining her actions in not reporting fees to the firm, Respondent told Dr. Wahl that she felt that she needed to "right a wrong" that the firm had caused her, and that the employment contract she had signed was confusing.

Spencer Friedman, a psychologist, testified that he has been treating Respondent for nearly a year and that Respondent is making substantial progress toward understanding her maladaptive way of handling personal problems. Both doctors testified that the conduct that brought her before this Hearing Board is amenable to therapy and that her prognosis is good and will continue to improve with additional therapy.

### Restitution

On February 14, 2007 Respondent submitted a check to the firm in the amount of $4,500.00 in an effort to make restitution. The check, however, was returned because the firm had since been dissolved. The Hearing Board finds that the proper amount of restitution is $5,970.05 and is determined as follows:

Total fees and costs placed into Respondent's COLTAF     $12,399.06 [25]

---

23. Respondent testified that she never read the employment contract and was not certain she was bound by its terms.

24. See Parties' Stipulated Exhibit 19.

25. See Parties' Stipulation of Facts, ¶ 13.

| | |
|---|---|
| Subtract costs portion | $ 2,630.70 [26] |
| Net fees diverted from the firm | $ 9,768.36 |
| | |
| Multiply by 50% under Employment Agreement [27] | $ 4,884.18 |
| Add back expenses debited by firm | $ 1,085.87 [28] |
| | |
| Total restitution: | $ 5,970.05 |

## IV. CONCLUSIONS OF LAW— SUBSTANTIVE ALLEGATIONS

■ The Hearing Board finds clear and convincing evidence that Respondent knowingly converted funds belonging to Powers Phillips, P.C. when she, unilaterally, without authorization, and without providing notice to anyone at the firm, deposited fees she collected as an employee of the firm into a COLTAF account she had established for her own use and benefit. Respondent had an obligation to provide the firm with 100% of the fees she collected in July, August, and September 2005 pursuant to the employment agreement. The Hearing Board finds Respondent's explanation that she believed in good faith that she had been authorized to become a subtenant and keep the fees collected in July, August, and September, rings hollow when looking at the substantial direct and circumstantial evidence to the contrary.

- Respondent continued to allow the firm to pay her portion of the rent while she claimed that she was a lessee.
- Respondent filed pleadings that identified herself as a member of the firm while she collected fees for her own benefit.
- Respondent created an LLC and a COLTAF account that she alone controlled but did not let the firm know of her activities.
- When members of the firm inquired about her failure to produce fees in July, and August Respondent told them that the fees would be forthcoming. She did not, however, say that the fees belonged to her and not the firm.
- When the firm found out that Respondent issued a check to a firm client and

asked Respondent to produce her bank records, Respondent resisted their request as she did when the People asked for the same.

■ The Hearing Board also finds clear and convincing evidence that Respondent knowingly acted dishonestly when she told shareholders of the firm that she had not collected any fees in July, August, and September 2005. Finally, Respondent knowingly acted dishonestly when she repeated this assertion to the People during the course of their investigation. The Hearing Board therefore finds clear and convincing evidence that Respondent violated the following rules of professional conduct as alleged in the Complaint:

- **First Claim,** Colo. RPC 8.4(c) [a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation] (knowing conversion) for failing to remit to the firm fees she earned as an employee in July, August, and September.
- **Second Claim,** Colo. RPC 8.4(c) [a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation] for falsely telling the firm, as well as the People, that she had not collected any fees in July, August, and September and that she had disclosed to the firm all fees she had earned during this period of time.
- **Third Claim,** Colo. RPC 1.8(e) (prohibition on the advancement of funds) for improperly advancing funds to a client. This claim, including a violation of C.R.C.P. 251.5, was resolved in favor of the People on summary judgment.

## V. SANCTIONS

The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law are the guiding

---

26. *See* Parties' Stipulated Exhibit 30, Bates Stamp LB 1812.

27. This represents the portion to which the firm was entitled. *See* Parties' Stipulated Exhibit 1, Bates Stamp LB0039.

28. This figure of $1,085.87 is the result of adding $103.00 and $132.48 (from Parties' Stipulated Exhibit 2, Bates Stamp LB0103) and $850.39 (from Parties' Stipulated Exhibit 5, Bates Stamp LB0298).

authorities for selecting and imposing sanctions for lawyer misconduct. The appropriate sanction depends upon the facts and circumstances of each case.

### Analysis Under the ABA Standards

ABA *Standards* 4.11 deals with a duty a lawyer has to clients. It states:

> Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.[29]

ABA *Standards* 5.11(b) and 5.13 deal with a lawyer's violation of duties owed to the public. They state:

> Disbarment is generally appropriate when a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice law.[30]

> Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.

However, before imposing a sanction after a finding of lawyer misconduct, ABA *Standard* 3.0 directs the Hearing Board to first consider the following factors to determine whether the presumed sanction is appropriate:

- The duty violated;
- The lawyer's mental state;
- The actual or potential injury caused by the misconduct; and
- The existence of aggravating or mitigating factors.

### A. THE DUTY VIOLATED

The Hearing Board finds Respondent violated duties to her clients, the public, and the legal profession. The public expects the lawyer to be honest and Respondent failed to maintain the standards of personal integrity upon which the public and legal community rely.

### B. THE LAWYER'S MENTAL STATE

The Hearing Board finds Respondent acted knowingly when she collected attorney fees in July, August, and September 2005 and failed to remit them to the firm. The fees had been entrusted to her, she knew a portion of the fees belonged to the firm, and she knew she did not have authorization to keep the fees. Whether Respondent had the conscious objective or purpose to accomplish a particular result (converting the fees) is irrelevant. *See* ABA *Standards* 4.11 and Definitions ("Knowledge").[31]

Respondent also acted knowingly at the time she told the firm (and later the People during their investigation) that she had reported all collected fees and she knew that this was a dishonest statement. *See* ABA *Standards* 5.1.

### C. THE ACTUAL OR POTENTIAL INJURY

The Hearing Board finds Respondent caused injury and potential injury to the individual members of the firm, the legal profession and the public. When a lawyer fails to act honestly, her lack of integrity affects the legal profession even though the conduct did not directly involve interaction with a client. Testimony from shareholders in the firm demonstrates actual and substantial potential harm to the firm's economic position, as well as the breach of trust and

29. Although this standard refers to conversion from a client, Colorado case law treats conversion from third parties, including one's law firm as breaches of ethics calling for disbarment. *See In re Thompson*, 991 P.2d 820 (Colo.1999).

30. This standard involves lawyer conduct involving any intentional conduct other than "serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or

theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses."

31. "Knowledge" is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result. ABA *Standards*, Definitions.

personal anguish the members of the firm experienced following their discovery that Respondent, while continuing to hold herself out to them as an employee, had opened a COLTAF account and had deposited fees in-part belonging to the firm.

## D. AGGRAVATING AND MITIGATING FACTORS

### 1. MATTERS IN AGGRAVATION, ABA *STANDARD* 9.2

The Hearing Board considered evidence of the following aggravating circumstances in deciding the appropriate sanction.

### Dishonest Motive—9.22(b)

Respondent acted with a dishonest motive in failing to disclose the fees she collected for July, August, and September 2005. She also acted with a dishonest motive when she reported to the firm that she had not collected fees in July, August, and September. Respondent later acted deceptively when she told the People that she had remitted all attorney fees to the firm and had not collected any in July, August, and September.

While Dr. Wahl concluded that Respondent's actions had not been motivated by malice or intent to harm anyone, we nevertheless find Respondent acted deceptively and dishonestly. Had Respondent's actions been driven by a mental illness or serious personality disorder, a different finding might be appropriate. But as both experts testified, Respondent did not suffer from a serious mental disease or personality disorder.

### A Pattern of Misconduct—9.22(c)

Respondent failed to tell members of the firm that she had essentially stopped abiding by the terms of the employment agreement as of July 2005. At the same time, Respondent started to divert fees she received to accounts she alone controlled. This failure to disclose and misrepresentation by omission continued for three months.

### Deceptive Practices During the Disciplinary Process—9.22(f)

Likewise, Respondent's conduct in dealing with the People showed a continuing pattern of deceit. She failed to provide bank records when the People requested them in May 2006.[32]. The People eventually obtained the records after they subpoenaed them from the bank. After the People subpoenaed the bank records, Respondent finally admitted she kept fees from clients while working at the firm, but then claimed two members of the firm orally agreed to such an arrangement. This brinkmanship in terms of disclosures formed a continued pattern of misconduct throughout the investigative process this case.

### Refusal to Acknowledge the Wrongful Nature of Conduct—9.22(g)

Although the doctors testified that Respondent is making substantial strides toward understanding her maladaptive behavior, she has not acknowledged the wrongful nature of her conduct. When first confronted by the People, Respondent argued that the firm's claim that she may have converted funds was baseless. Respondent maintains members of the firm told her that she could treat herself as a subtenant despite the lack of any evidence to support this assertion other than her own testimony.

Furthermore, Respondent testified that she thought it was unfair for the firm to lead her to believe she could change her status as an employee at any time, and later rely on the employment agreement to say she could not. Respondent told Dr. Wahl she acted in an effort to right a wrong she felt she had suffered at the hands of the firm. Respondent also told Dr. Wahl the employment agreement was confusing and she felt the firm was taking advantage of her. Thus, the Hearing Board finds Respondent refuses to acknowledge the wrongful nature of her conduct.

### Indifference to Making Restitution—9.22(j)

Although the People argue that the Hearing Board should find that Respondent has

---

**32.** *See* Parties' Stipulated Exhibit 16.

been indifferent to making restitution, the record shows that she attempted to pay the firm $4,500.00 on or about February 14, 2007. While such an attempt is well after the People commenced their investigation, we cannot make a finding that she is *indifferent* to making restitution based on this record.

## 2. MATTERS IN MITIGATION, ABA STANDARD 9.3

The Hearing Board considered evidence of the following mitigating circumstances in deciding the appropriate sanction.

**Absence of a Prior Disciplinary Record—9.32(a)**

The record shows Respondent has not been subject to the disciplinary process in the past.

**Timely Good Faith Effort to Make Restitution or Rectify Consequences of Misconduct—9.32(d)**

On February 14, 2007, Respondent attempted to rectify the consequences of her misconduct by tendering a check in the amount of $4,500.00 to the firm. Although took no further action after the check was returned, she still made an effort and we acknowledge this effort.

**Inexperience in the Practice of Law—9.32(f)**

While Respondent was inexperienced in the practice of the law at the time of her misconduct, this mitigating factor has no weight when the substantive violation involves dishonesty.

### Analysis Under Case Law and ABA Standards

■ Knowing conversion "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *People v. Varallo*, 913 P.2d 1, 11 (Colo.1996) (quoting *In re Noonan*, 102 N.J. 157, 506 A.2d 722, 723 (1986)). Neither the lawyer's motive in taking the money, nor the lawyer's intent regarding whether the deprivation is temporary or permanent, are relevant for disciplinary purposes. *Id.* at 10–11.

The Colorado Supreme Court has indicated that lawyers are "almost invariably disbarred" for knowing misappropriation of client funds *or one's law firm. Thompson*, 991 P.2d 820, 823 (Colo.1999); *People v. McGrath*, 780 P.2d 492, 493 (Colo.1989) ("the Court would not hesitate to enter an order of disbarment if there was no doubt that the attorney engaged in knowing conversion of his client's funds"); *In re; People v. Lavenhar*, 934 P.2d 1355 (Colo.1997); *People v. Lefly*, 902 P.2d 361 (Colo.1995); *People v. Young*, 864 P.2d 563 (Colo.1993) (conversion of clients' funds warrants disbarment even absent prior disciplinary history and despite cooperation and making restitution). For purposes of our analysis, we treat the misappropriation of funds from a lawyer's own law firm and that from a client as the same.

The Hearing Board notes that the cases in which the Colorado Supreme Court has ordered a sanction short of disbarment for knowing conversion of funds are few, and distinguishable from the present case. For example, Respondent did not offer evidence that she suffered from a *serious mental disorder* that caused her misconduct, as was the case in *People v. Lujan*, 890 P.2d 109 (Colo. 1995). Nor do the facts present a case of technical conversion; that is, one in which the Respondent simply acted negligently in handling funds belonging to another. *See People v. Dickinson*, 903 P.2d 1132, 1138 (Colo.1995).

■ The Hearing Board carefully considered the mitigating factors and find that they are not sufficiently compelling to warrant a sanction other than disbarment. *See In the Matter of Fischer*, 89 P.3d 817 (Colo.2004) and *People v. Nulan*, 820 P.2d 1117 (Colo. 1991). In determining Respondent's state of mind, the Hearing Board finds Respondent's failure to disclose her actions to the firm most telling. If Respondent in good faith believed that she no longer considered herself to be an employee of the firm, she would not need to conceal the fact that she placed fees into her COLTAF account in July, August, and September. Instead of disclosing these facts, Respondent assuaged the firm's

concerns about not collecting fees by telling them the money was forthcoming.

Finally, the Hearing Board finds Respondent engaged in knowing conduct involving dishonesty, fraud, deceit and misrepresentation that adversely reflects on her fitness to practice. The Hearing Board believes ABA *Standards* 5.13, and not ABA *Standards* 5.11(b), is the most applicable standard due to the Hearing Board's finding that Respondent acted knowingly as alleged in the Complaint. Respondent's dishonest conduct alone would warrant a suspension due to the underlying facts and aggravating factors present in this case. *See People v. Rudman,* 948 P.2d 1022, 1028 (Colo.1997). However, the sanction of disbarment applicable for Respondent's knowing conversion subsumes the lesser sanction for her dishonest conduct, as well as her conduct in advancing funds to her client.

## VI. *CONCLUSION*

One of the primary goals of our disciplinary system is to protect the public from lawyers who pose a danger to them. The clear and convincing facts reveal Respondent violated Colo. RPC 8.4(c) when she knowingly converted funds belonging to the firm and when she knowingly acted dishonestly toward the firm and the People. The PDJ also found she violated Colo. RPC 1.8(e) when she advanced funds to her client. Respondent therefore violated duties owed to her clients, the public, and the legal profession.

Absent extraordinary factors in mitigation not presented here, the ABA *Standards* and Colorado Supreme Court case law applying the ABA *Standards* both support disbarment for her most serious conduct of knowing conversion under the *Varallo* decision.[33] *See also In re Thompson,* 991 P.2d 820, 823–24 (Colo.1999). Upon consideration of the nature of Respondent's misconduct, her mental state, the significant harm and potential harm caused, and the absence of significant mitigating factors, the Hearing Board con-

cludes there is no justification for a sanction short of disbarment.

## VII. *ORDER*

The Hearing Board therefore **ORDERS:**

1. **LIGITA S. BARDULIS,** Attorney Registration No. 32027 is hereby **DISBARRED** from the practice of law, effective thirty-one (31) days from the date of this order.
2. **LIGITA S. BARDULIS SHALL** pay the costs of these proceedings. The People shall submit a Statement of Costs within fifteen (15) days from the date of this Order. Respondent shall have ten (10) days thereafter to submit a response.
3. **LIGITA S. BARDULIS SHALL** pay **RESTITUTION** in the amount of $5,970.05 to the shareholders of Powers Phillips, P.C.

---

**33.** The Hearing Board carefully considered the cases from the Colorado Supreme Court involving misappropriation of funds and concludes that those cases allow no leeway in determining the sanction here. Under those authorities, disbar-

ment is required. If those cases provided more discretion in determining the appropriate sanction in cases of misappropriation, the Hearing Board would have considered a sanction less severe than disbarment.