The PEOPLE of the State of Colorado, Complainant

v.

David Ross CALVERT, Respondent.

Nos. 09PDJ064, 10PDJ128.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Nov. 15, 2011.

## I. *SUMMARY*

In this consolidated action, the Hearing Board concludes Respondent's many self-

serving acts of misconduct represent an acute breach of client trust warranting disbarment. In one case, Respondent plied a vulnerable client with loans in excess of one hundred thousand dollars without memorializing the terms of those loans. To secure his interest in those loan funds, he recorded a false deed of trust on the client's home in a second client's name without the clients' knowledge or consent. Respondent then attempted to persuade the second client to assign the deed of trust to Respondent's real estate company which, when taken together with his earlier acts, signals a calculated scheme to deprive his client of her home. In another case, he failed to supervise a non-lawyer while she provided direct legal services to two of his law firm's clients, resulting in the dismissal of the clients' bankruptcy petitions filed by the paralegal under Respondent's name using his federal bankruptcy court electronic log-in and password.

## II. PROCEDURAL HISTORY

The People filed a complaint in case number 09PDJ064 on June 26, 2009. Following an extension of time to answer, Respondent filed an answer on October 13, 2009. A hearing in the case was set to begin April 6, 2010, but was rescheduled for January 4, 2011, when Respondent experienced significant health issues. By order of November 29, 2010, the hearing was again rescheduled to May 3, 2011, due to concerns about Respondent's health.

On December 9, 2010, the People filed a complaint in case number 10PDJ128. Respondent answered on January 14, 2011. The People then filed a motion to consolidate the two cases, which the PDJ granted on April 25, 2011, vacating the May 3, 2011, setting and scheduling the hearing in the consolidated action to begin on July 6, 2011. Immediately prior to the hearing, the PDJ declined to again continue the proceeding based on Respondent's concern that his prescribed medication might have "mind-altering" effects. The PDJ observed Respondent appeared cogent and articulate, evincing no problem recalling events or understanding questions, and the PDJ thus determined there was no reason why Respondent would be unable to participate meaningfully in the hearing.

At the hearing, the Hearing Board heard testimony from Linda Weinhauer, Stanislav Weinhauer, Cindy Weinhauer–Howe, Diane Mayberry, Desiree Mayberry, Stephen Peters, Kelly Sweeny, Jeanne Jagow, Erdal Sonmez, Afthimia Sonmez, James Reitz, Yetty Yhin, Michelle Rahn, and Respondent. The PDJ admitted the parties' stipulated exhibits 1–99 and the People's exhibits 101–102.

At the conclusion of the hearing, the PDJ instructed both parties to file written closing arguments, which were submitted on August 1, 2011. Respondent filed an amended closing argument on August 23, 2011, with no objection from the People.

## III. FINDINGS OF FACT AND RULE VIOLATIONS

The Hearing Board finds the following facts and rule violations have been established by clear and convincing evidence.

### Jurisdiction

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on April 13, 1962. He is registered upon the official records, attorney registration number 01828, and is thus subject to the jurisdiction of the Hearing Board in these disciplinary proceedings.[2] Respondent's registered business address is 5460 South Quebec Street, Suite 388, Greenwood Village, Colorado 80111.

### Weinhauer Matter[3]

In April 2008, Stanislav (Stanley) Weinhauer ("Mr. Weinhauer"), an immigrant from the former communist state of Czechoslovakia, hired Respondent to represent him. Mr. Weinhauer sought to reach a final settlement with his former employer, King Soopers, in a worker's compensation matter, having been injured on the job in 1993 and

2. *See* C.R.C.P. 251.1(b).

3. The People brought claims related to the Weinhauer matter in case number 10PDJ128.

placed on disability. Mr. Weinhauer had been represented by several prior attorneys, but he sought Respondent's assistance when he was referred by Jana Kantor ("Kantor"), a Weinhauer family friend and a pro bono client of Respondent. Respondent and Mr. Weinhauer executed a fee agreement on July 18, 2008, which provided Respondent would be paid twenty percent of Mr. Weinhauer's gross recovery.

On February 17, 2009, Respondent met with Mr. Weinhauer and his wife, Linda Weinhauer ("Mrs. Weinhauer"), to discuss a settlement proposal. One of Respondent's staff members memorialized the comprehensive settlement package in a written memorandum: King Soopers would pay an agreed amount, plus additional funds for a Medicare set-aside (which could only be accessed by Mr. Weinhauer to pay future medical expenses related to his worker's compensation injury), and Respondent would reduce his fee to ten percent of the gross recovery.[4]

Although the Weinhauers were hesitant to do so, they eventually agreed to settle the case, and they visited Respondent's office to sign the settlement agreement on February 27, 2009. During this meeting, they requested that Respondent review the settlement paperwork with them and explain how the Medicare set-aside would be funded. They also expressed concern about outstanding medical bills, but Respondent assured them he would handle payment of all such bills. Relying on these representations, Mr. Weinhauer executed the settlement agreement and received all of the settlement funds due him.

During the spring of 2009, Respondent wrote letters on the Weinhauers' behalf to resolve these billing issues with the Division of Worker's Compensation, but he was not successful in doing so.[5] As a result, the Weinhauers began to receive calls around that time from collection agencies seeking payment of four unpaid medical bills. Because they understood from Respondent's assurances that he would handle these outstanding medical bills, the Weinhauers called Respondent, with assistance from their daughter, Cindy Weinhauer–Howe ("Weinhauer–Howe"), to voice their concerns and urge him to take action. Weinhauer–Howe and Respondent offered divergent versions of this discussion; Weinhauer–Howe testified that Respondent promised to "take care" of the bills and then hung up on her, while Respondent claimed she "excoriated" him for his failure to resolve the payment issues. Nevertheless, both agreed that the call concluded with Respondent volunteering to pay these bills out of his own pocket.

On July 23, 2009, Respondent drafted letters to the health care providers whom Mr. Weinhauer still owed for medical treatment, enclosing with each letter a check "as an offer of settlement to conclude th[e] matter to closure."[6] Respondent sent Mr. Weinhauer copies of these letters and copies of the front of the four checks[7] to demonstrate they had been paid, promising him the matter had been resolved. Despite these assurances, however, Respondent placed stop payment orders on two of the checks without notifying Mr. Weinhauer, leaving those bills unpaid. Indeed, Mr. Weinhauer only discovered these bills remained outstanding when collection agencies contacted him to seek payment.

The People argue Respondent's failure to notify Mr. Weinhauer that he never paid these two medical bills constitutes a violation of Colo. RPC 1.4(a)(2) and (3) and Colo. RPC 8.4(c). They argue that Respondent failed to comply with his duty, pursuant to Colo. RPC 1.4(a)(2) and (3), to reasonably consult with Mr. Weinhauer about the means by which his objectives were to be accomplished and to keep Mr. Weinhauer reasonably informed about the status of his matter. And they contend Respondent misled Mr. Weinhauer, in contravention of Colo. RPC 8.4(c), by promising to pay his medical bills, then failing to inform him that two bills remained unpaid following issuance of the stop payment orders.

4. Ex. 3.

5. Exs. 11–12.

6. Ex. 13.

7. Ex. 18.

Respondent argues his conduct amounts to nothing more than excusable neglect. He testified his secretary inadvertently wrote all four checks from his COLTAF account; when he realized the error, he placed stop payment orders on two of them, restoring funds to his trust account for the two cleared checks.[8] While Respondent admitted he never reissued the checks or notified Mr. Weinhauer that the two bills remained unpaid, he maintains that "this was because of an oversight on [his] part, not a willful action to harm [Mr. Weinhauer] in any way." [9] Respondent also contends his failure to reissue payment was an ancillary issue, and payment of those bills was not properly considered among Mr. Weinhauer's "objectives" of the representation.

■ The Hearing Board concludes Respondent violated Colo. RPC 8.4(c). While Respondent argues in his written briefs that he simply forgot to notify Mr. Weinhauer of the stop payment order, his statements on the stand belie this contention. Indeed, he testified that upon issuing the stop payment order, he "realized [he] had no obligation to take care of [the bills]" and therefore declined to reissue payment. That Respondent guaranteed Mr. Weinhauer the bills had been paid *before*, rather than *after*, the stop payment order was placed is of no moment: by his own admission, Respondent knew Mr. Weinhauer had relied upon his representations that the bills had been paid, and he made no effort to correct Mr. Weinhauer's misapprehensions after placing the stop payment order. By failing to inform Mr. Weinhauer that he no longer intended to honor his promise, Respondent misrepresented to Mr. Weinhauer that all four medical bills had been paid, thereby violating Colo. RPC 8.4(c).

■ Respondent also violated Colo. RPC 1.4(a)(2) and (3), since he failed to keep Mr. Weinhauer reasonably informed about the resolution of his medical bills and the means by which Mr. Weinhauer's objectives would have to be accomplished. As an initial matter, we disagree with Respondent's characterization of this matter as peripheral. The Weinhauers' testimony, as well as that of Weinhauer–Howe, leads us to believe that this issue was critical to Mr. Weinhauer, such that Respondent's February 2009 promise to "take care" of the outstanding bills was a significant inducement to Mr. Weinhauer to accept the settlement.

We also find unavailing Respondent's attempt to disclaim his obligation to communicate with Mr. Weinhauer concerning this matter. Comment 3 to Colo. RPC 1.4 explains that even in the most exigent of circumstances a lawyer "must nonetheless act reasonably to inform the client of actions the lawyer has taken on the client's behalf." And comments 5 and 7 to the rule shed light on that duty to communicate; comment 5 notes that a lawyer "should fulfill reasonable client expectations for information consistent with the duty to act in the client's best interest," while comment 7 counsels against the "withhold[ing of] information to serve the lawyer's own interest or convenience...." After receiving copies of the four checks, Mr. Weinhauer reasonably expected Respondent to alert him to any change in circumstance, and Respondent's awareness that Mr. Weinhauer had relied on his promises obliged him to notify Mr. Weinhauer about the stop payment order, even if doing so would have caused the Weinhauers to react in a manner he deemed unpleasant or inconvenient.

### Business Transactions with Mayberry and the Weinhauers[10]

Diane Mayberry ("Mayberry") first met Respondent following the death of her husband, Earl. Mayberry was listed as the primary beneficiary on her husband's insurance policy, and she had come into a considerable sum of money when he passed away. She chose to apply a significant portion of those

---

8. Ex. 21. Respondent never clarified why he placed stop payment orders on just two of the four checks, which all were drafted from his COLTAF account.

9. Respondent's Tr. Br. at 2; *see also* Respondent's Am. Closing Arg. at 5.

10. The People brought claims related to the Weinhauer/Mayberry transaction in case number 10PDJ128.

funds toward paying off the mortgage on her home, only after which she realized her name was not listed on the title.

Mayberry hired Respondent to secure title to the house in her name, which he did successfully,[11] despite the efforts of Mayberry's children to prevent him from doing so because, as Mayberry candidly acknowledged—and as Desiree Mayberry, her daughter, confirmed—Mayberry has long struggled with a methamphetamine addiction, a bipolar disorder, and suicidal ideation. Respondent represented Mayberry throughout 2009 and 2010; her probate matter was formally closed on June 6, 2011.[12] During the course of the representation, Mayberry told Respondent she had paid off the mortgage on her house, which she owned free and clear. According to Mayberry, she also "specifically told him" about her addiction.

In early March 2009, Respondent and Mayberry began to discuss a loan transaction. Mayberry hoped to remodel her home and rent it for monthly income after relocating to Atlanta, Georgia, with a new boyfriend; Respondent offered Mayberry a loan to do so on the understanding that Mayberry would repay Respondent out of the equity of her house. Thus, on March 12, 2009, Respondent loaned Mayberry $30,000.00;[13] he neither memorialized the loan in writing, nor advised her to seek the advice of independent counsel, nor obtained her written informed consent to carry through with the transaction.

Around the same time, Respondent approached the Weinhauers with an investment proposal. While speaking with Respondent at an earlier time, the Weinhauers had voiced concern that following the worker's compensation settlement they would no longer receive weekly permanent disability payments. After they received the settlement funds, Respondent therefore informed the Weinhauers that another of his clients, Mayberry, was in need of $80,000.00 to refurbish her home and was willing to pay eight percent interest on a loan, given her bad credit.[14] Respondent advised the Weinhauers to loan Mayberry this money, suggesting this investment could provide a reliable monthly income stream for their family. Mr. Weinhauer recalled that he thought the scheme was "fishy," questioning why Mayberry would be willing to pay a higher interest rate than the market rate. Mrs. Weinhauer testified that she told Respondent "absolutely not ... I am not [a] businesswoman." She recalled "always saying no, no, no, no, no, no."

Nevertheless, on March 15, 2009, Respondent secured Mayberry's signature on a deed of trust and promissory note.[15] The promissory note stated that the Weinhauers agreed to loan Mayberry $84,000.00 at eight percent interest, payable monthly beginning on April 15, 2009, and fully due in 180 days.[16] The deed of trust secured the Weinhauers' interest in the promissory note with equity in Mayberry's house.[17] These instruments were signed only by Mayberry; the Weinhauers' signatures appear on neither document. Indeed, the Weinhauers never loaned Mayberry any money, and they were not aware of either document at the time May-

---

11. Ex. 26.

12. Ex. 28.

13. Ex. 30.

14. Respondent testified that he intended for the Weinhauers to lend Mayberry money so she could "reimburse" Respondent for the sums he and his real estate company had lent her. Evidence presented at the disciplinary hearing does not make clear why Respondent suggested to the Weinhauers that Mayberry sought an $80,000.00, rather than a $30,000.00, loan.

15. Mayberry testified that in March 2009, while high on drugs, she had signed a handwritten promissory note evidencing her debt to Respon-

dent, but she did not recall ever having signed a deed of trust or a promissory note indebting her to the Weinhauers. Indeed, she questioned whether the signature appearing on these documents is hers. No clear and convincing evidence was presented to support the theory that anyone other than Mayberry endorsed these documents—to the contrary, a notary public's basic journal, found at exhibit 7, suggests Mayberry signed a "deed of distribution" in the notary's presence. Accordingly, we assume for the purposes of this opinion that Mayberry did, in fact, sign both documents but was unaware of their content and import.

16. Ex. 9.

17. Ex. 10.

berry signed them. After four months passed—and three months after Mayberry was to begin making monthly payments under the promissory note—Respondent recorded the deed of trust with the City and County of Denver on July 27, 2009, unbeknownst to Mayberry or the Weinhauers.[18]

From March 2009 to the spring of 2011, Mayberry borrowed approximately $150,000.00 from Respondent, much of which he loaned through his own real estate company, Calvert & Company.[19] With respect to each transaction, Respondent failed to provide Mayberry the terms of the loan in writing, neglected to recommend she seek independent counsel's advice, and never secured her written informed consent regarding their conflict of interest in the transaction. Some of the checks Respondent wrote for Mayberry were made payable to Mayberry directly; others were drafted to Steve Ward ("Ward"), a relative of Mayberry who was hired to renovate her house,[20] and Craig Sloop, an acquaintance of Mayberry who received funds on her behalf. Meanwhile, during Mayberry's sojourn in Atlanta, Respondent visited her house three to four times a week, enabling him to oversee renovation work and stage the property with furniture to facilitate its showing to potential buyers.[21] Respondent also drew up paperwork to sell Mayberry's house; although Mayberry acknowledged she often changed her mind as to what to do with the house, she also claimed she never really wanted to put it on the market.

In the summer of 2009, Respondent asked Mrs. Weinhauer and her friend, Kantor, to visit his office. When they arrived, he presented Mrs. Weinhauer with an assignment of the deed of trust in Mayberry's house, which would transfer all of the Weinhauers' interest in the deed of trust to Calvert & Company. Respondent told Mrs. Weinhauer that his office had made a mistake by recording the deed of trust, and he requested that she sign the document. She demurred and instead took the assignment and the deed of trust home; ultimately, the Weinhauers determined not to execute the assignment. Mrs. Weinhauer explained that she had never met Mayberry before; that neither she nor her husband ever told anyone, including Kantor, they wanted to loan Mayberry money; and that she did not understand—and Respondent did not explain—the legal ramifications of signing the assignment. Mr. Weinhauer reasoned, "if [Respondent] didn't want my signature when he filed [the deed of trust], why would he want my signature after he filed it?"[22]

His request rejected, Respondent enlisted Kantor in a campaign to pressure the Weinhauers to execute the assignment. With that aim, Respondent badgered the Weinhauers every time they visited his office, telephoned them often, wrote them several letters, and pushed Kantor to bother Mrs. Weinhauer at work. As Respondent testified, the idea of obtaining the assignment was to "secure the interest of Calvert & Company in the money it had already expended" in loans to Mayberry. In December 2009, the Weinhauers terminated Respondent's representation and lodged a complaint with the People against

---

**18.** Respondent testified that the Weinhauers, as beneficiaries of the deed of trust, were not required to sign the document in order for it to be recorded in county land records.

**19.** Ex. 30.

**20.** Mayberry testified she intended only $5,000.00 of those funds to go to Ward for drywall work, and she entrusted Respondent to oversee those improvements. Mayberry said she was shocked to learn, upon returning to Denver, that Respondent had been "funneling" .tens of thousands of dollars to Ward for renovations she never approved and with which she was displeased, noting that she cannot currently rent out her house because "half of the stuff in the house isn't completed." *See also* Ex. 20.

**21.** Ex. 25.

**22.** The Weinhauers articulated these concerns in a letter to the People, written with Weinhauer–Howe's assistance in April 2010, in which they state: "Why would a Deed of Trust even be prepared in our name without Mr. Calvert directly conferring with us [to] see if that was indeed our wishes?! We never wished for that, nor did we have any conversations with Mr. Calvert, or anyone else for that matter, in regards to this matter. How does he have the authority to use our names, without our permission, on a public and legally binding document without our expressed written agreement or consent???!" Ex. 22 ¶ 9.

him.[23]

Thereafter, Respondent prepared a release of the deed of trust. In the spring of 2010, he contacted Desiree Mayberry, Mayberry's daughter, saying that her mother had borrowed so much money from him that she had allowed a lien to be put on her house to guarantee payment and, accordingly, that he had arranged for the Weinhauers to record the deed. Desiree Mayberry testified that Respondent, having learned she had recently been laid off, approached her with a "business proposition," offering to pay her $500.00 if she could persuade the Weinhauers to release the deed of trust. He gave her a folder with the Weinhauers' telephone number, Mrs. Weinhauer's work address, the deed of trust, and a draft release of the deed of trust,[24] exhorting her to "put a little heat on [the Weinhauers]" and to "take a few of your family members and go."[25] She took the folder, but rather than contacting the Weinhauers, she resolved to report Respondent. It was not until after Desiree Mayberry presented her mother with a copy of the deed of trust that Mayberry realized title to her house had been clouded; Mayberry said, "I got really irate when Desiree showed me the papers that [Respondent] had a lien on my house."

Having been unable to convince the Weinhauers to sign an assignment or a release of the deed of trust, Respondent wrote to them on April 30, 2010, stating that Desiree Mayberry would be contacting them to make arrangements to obtain their signatures and warning, "Should you refuse to do so . . . she has advised me that she will obtain an attorney, file a lawsuit, and request attorney fees and court costs to be paid by you."[26] In "a state of anger," as he described it, Respondent also demanded that the Weinhauers pay him the sum he had earlier discounted from his fees in the worker's compensation matter,

writing, "I had agreed to discount the fee [by an agreed amount], however, after all that has transpired, I feel I am entitled to [that money] as above referenced. I will look forward to your check."[27] On June 25, 2010, Respondent reiterated these threats in a letter, demanding the Weinhauers pay him additional fees and warning that if they refused to sign the release of the deed of trust "it will be necessary for *my client* [Mayberry] to hire an attorney and to bring an Action at Law, the same of which could be very expensive, protracted, and very time consuming."[28]

The People allege five claims based upon Respondent's conduct in this matter. First, they claim Respondent violated Colo. RPC 8.4(c) by recording a false deed of trust in violation of that rule's injunction against conduct involving dishonesty, fraud, deceit, or misrepresentation. Respondent argues that in filing the deed of trust, he had a good faith belief he was proceeding according to the Weinhauers' wishes. He explains that Kantor conferred with the Weinhauers and took them to look at the property, after which Kantor "told him the Weinhauers wanted to enter into the business transaction with Mrs. Mayberry."[29] Though, as he admitted, he filed the deed of trust without the Weinhauers' verbal or written authorization, he insisted that Kantor had assured him the Weinhauers wished to invest but did not want to provide the funds until the deed was recorded.

■ The Hearing Board has no trouble concluding Respondent violated Colo. RPC 8.4(c). Indeed, we are exceedingly dismayed by Respondent's misconduct, which we can only characterize as fraudulent. Without notice to the Weinhauers, Respondent officially recorded a document purporting to memorialize a loan they had categorically refused to make. As such, even were Respondent to

---

23. Exs. 16 & 29.

24. Ex. 31.

25. Desiree Mayberry interpreted Respondent's comment to suggest that she and her family members approach the Weinhauers in a threatening manner. She reasoned that Respondent had referenced her family because he had earlier represented her brother on assault charges.

26. Ex. 24.

27. *Id.*

28. Ex. 97 (emphasis added).

29. Respondent's Am. Closing Arg. at 7.

have filed the deed in good faith on Kantor's alleged instructions, he would have acted, at a minimum, recklessly.[30] But, to the contrary, we find Respondent recorded the deed in bad faith with the intention of profiting from his deceit.

In so finding, we conclude Respondent's credibility is severely lacking. Indeed, we are particularly influenced by the discrepancy between his argument in the disciplinary hearing and his explanation to the Weinhauers. Before the Hearing Board, he argued that he believed the Weinhauers had instructed him, through Kantor, to record the deed; yet when he first met with Mrs. Weinhauer following the recording, he claimed his office had simply made a mistake in recording the deed, asking her to sign the assignment to rectify the error. Further, documentary evidence casts a pall on Respondent's testimony that Kantor greenlighted the recording: in a letter to the People, Kantor writes, "After Stanley took the settlement we (Stanley or Linda or [Respondent]) never mentioned any money...." [31] Considering the totality of these circumstances, we are convinced Respondent intentionally recorded the deed of trust, knowing it was false.

██ The People next plead two separate violations (Claims IV and V) of Colo. RPC 1.7(a), which provides that a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. Specifically, they aver Respondent represented both Mayberry and the Weinhauers, the former as borrower and the latter as purported lenders, thereby positioning them as clients with directly adverse interests in the deed of trust. The People also assert Respondent violated Colo. RPC 1.7(a) by representing Calvert & Company while pressuring the Weinhauers to assign the deed of trust to his own company.

Respondent contests these claims by alleging he represented neither Mayberry as a borrower, nor the Weinhauers as lenders, implying his representation of both parties had ended before he orchestrated the transaction. He also disputes that he hoped to benefit from the transaction and instead maintains he "was only looking to help out two different people as he is prone to do." [32]

We determine Respondent's effort to arrange a transaction between Mayberry and the Weinhauers, and his later attempt to persuade the Weinhauers to assign Calvert & Company the deed of trust, infracted Colo. RPC 1.7(a). As to the first matter, we disagree with Respondent on factual and legal grounds. Factually, we find Respondent served as both Mayberry's and the Weinhauers' counsel throughout 2009—during which time Respondent drafted and recorded the deed of trust and attempted to secure the Weinhauers' assignment of that document.[33] In fact, he described Mayberry as "his client" in a June 2010 letter to the Weinhauers.[34] Legally, we conclude Respondent misconstrues his obligations under Colo. RPC 1.7(a), the comment to which makes clear that "absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated." [35] Finally, Respondent's assertion that he never intended to profit from the deed of trust is refuted by his own testimony that his purpose in obtaining the Weinhauers' assignment was to secure Calvert & Company's interest in the sums it had loaned to Mayberry.

30. *See People v. Rader*, 822 P.2d 950, 953 (Colo. 1992) ("[T]he element of scienter is shown with respect to a violation of [the predecessor to Colo. RPC 8.4(c)] when it is established that the attorney deliberately closed his eyes to facts he had a duty to see or recklessly stated as facts things of which he was ignorant.") (quotation omitted).

31. Ex. 22 at Calvert000183.

32. Respondent's Am. Closing Arg. at 8.

33. *See People v. Bennett*, 810 P.2d 661, 664 (Colo. 1991) (noting that whether an attorney-client relationship exists depends, in part, on the client's belief). In this case, Respondent conceded in testimony that Mayberry was his client until her probate matter closed in June 2011, and the Weinhauers believed Respondent continued to act as their counsel until December 2009, when they terminated his representation. *See* Ex. 16.

34. Ex. 97.

35. Colo. RPC 1.7 cmt. 6.

The People also claim Respondent breached Colo. RPC 8.4(a), which provides a lawyer shall not attempt to violate the Rules of Professional Conduct. In support of that claim, they allege that Respondent attempted to enter into a business transaction with the Weinhauers without making the disclosures required by Colo. RPC 1.8(a), averring that he failed to offer fair and reasonable terms to the Weinhauers when seeking their assignment of the deed of trust, he failed to advise them in writing of the desirability of seeking independent legal counsel, and he failed to obtain their informed written consent.

Respondent challenges this claim on two grounds. First, he says he never attempted to enter into any transaction with the Weinhauers, a defense that founders, as it is grounded on the same denials we rejected when considering his Colo. RPC 8.4(c) arguments. Second, Respondent attests he "simply was not aware that he was required to obtain written consent or that he was required to advise Mr. Weinhauer that he could seek independent counsel," noting that he was licensed as a Colorado attorney in 1962, a time when "there was no requirement regarding written informed consent and the Rules of Professional Conduct were a lot more relaxed than they are today."[36] We likewise reject this argument. Although his status as a long-standing and senior member of the bar exempts Respondent from attendance at continuing legal education seminars,[37] it does not absolve him of the responsibility to familiarize himself with the Rules of Professional Conduct, nor does it excuse his failure to comply with their requirements. We find the People have clearly and convincingly established that Respondent violated Colo. RPC 8.4(a).

Last, the People allege that by loaning Mayberry money with the expectation he would acquire a possessory or pecuniary interest adverse to her, Respondent violated Colo. RPC 1.8(a), which proscribes such business transactions unless the terms are fully disclosed in writing and reasonably understood by the client, the client is advised in writing to seek independent legal counsel, and the client gives written informed consent to the transaction's terms. Respondent does not debate that he failed to provide these safeguards, but he protests that he never loaned Mayberry any money, as evidenced by the absence of any writing documenting the transactions, and he instead casts his transfer of money to Mayberry as a reflection of his "generosity and willingness to help others in need."[38]

The Hearing Board cannot adopt Respondent's gloss on these facts, in part because Mayberry plainly conveyed how crushed she felt by such a large debt burden, suggesting that she understood those funds to have been transferred not as a gift, but an obligation. Mayberry recalled wanting Respondent "out of [her] pocket," explaining, "he kept lending me money, and the amount kept going higher and higher." Desiree Mayberry likewise lamented her mother "feels like she's in a hole she can't crawl out, and it's killing her," and the loan has taken "a big toll" on Mayberry's mental health.

We also cast a jaundiced eye upon Respondent's explanation because it runs so contrary to reason and logic: we cannot fathom why an experienced lawyer would *give* more than a hundred thousand dollars to Mayberry, an admitted drug addict, simply because "he wanted to help [her] get her life on track, and generally saw the 'potential' that she had."[39] As Desiree Mayberry testified, Respondent "enabled" Mayberry's addiction by loaning her more money in two years than she had made in the previous ten, all the while warning Mayberry not to seek mental health treatment or substance abuse counseling because, on those grounds, her children might attempt to take title to her house. Indeed, Desiree Mayberry opined, "If he had the best interests of my mother in mind, he never would have loaned her that money.... He was slowly killing my mom." Mayberry herself echoed that sentiment, saying, "Am I alive and productive today because of [Re-

**36.** Respondent's Am. Closing Arg. at 9.

**37.** C.R.C.P. 260.5.

**38.** Respondent's Am. Closing Arg. at 10.

**39.** *Id.*

spondent]? Yes, because he got me out of binds, and no, because he gave me money to go forth with my addiction." These facts and testimony, coupled with Respondent's compromised credibility, lead us to the conclusion that Respondent loaned, rather than gifted, these significant sums to Mayberry without the protections conferred by Colo. RPC 1.8(a).

### Sonmez Matters[40]

For several years, Respondent employed Mandy Parrish, also known as Mandy Dobbs–Parrish and Brenda Dobbs ("Parrish"), as a law clerk and paralegal. Parrish is not licensed to practice law in Colorado or any other state.[41] Respondent hired Parrish upon a friend's request, and he found her "bright and personable." In fact, he testified that he "had no problems or difficulties with her at all. . . . I was very pleased with her, and I had no questions about loyalty, confidence, or trust."

In April 2006, Erdal (Eddie) Sonmez ("Mr. Sonmez"), originally from Turkey, was referred to Respondent by a family friend; Mr. Sonmez and his friend then met with Respondent at his office, where they discussed legal issues facing Mr. Sonmez's business and family. Mr. Sonmez remembered Respondent introducing him to Parrish, whom Respondent described as "my best attorney, my right hand."

Soon thereafter, Parrish visited Mr. Sonmez and his wife, Afthimia (Effie) Sonmez ("Mrs. Sonmez"), at their place of business, Nazar International Market ("Nazar"). Parrish introduced herself as an attorney in Respondent's firm,[42] and the Sonmezes solicited her assistance with four issues: (1) a bankruptcy filing; (2) filing a civil action to seek relief for their daughter, who had been bitten by a dog; (3) petitioning the United States Department of Agriculture for leniency in its assessment against Nazar of a three-year suspension in its right to accept food stamps; and (4) resolving a dispute with their landlord. That day, the Sonmezes drafted two checks, both payable to Parrish, from the Nazar business account—$750.00 for the food stamps issue and $509.00 for bankruptcy assistance.[43]

A few days later, the Sonmezes went to Respondent's office to discuss their matters with Parrish, and Respondent stopped in to visit with them. Mrs. Sonmez recalled being introduced to Respondent, and Parrish told him they were discussing the Sonmezes' bankruptcy petition. Respondent impressed Mrs. Sonmez as "the big boss, and everyone works for [him], so what [he] says goes." Mrs. Sonmez also remembered frequent interactions with Respondent during her twice-weekly visits to his office over the course of five months, when she discussed all four of her matters with Parrish and Respondent.

With respect to the food stamps petition, Parrish drafted several letters in late spring 2006 on "DP Paralegal Services" letterhead to seek redress on the Sonmezes' behalf,[44] but Mrs. Sonmez testified that nothing ever came of those efforts, and Nazar was forced to wait the full length of the original three-year suspension before it could again accept food stamps. Respondent did no work on the matter. Likewise, Parrish wrote several letters-on Respondent's firm letterhead—to opposing counsel in an attempt to resolve the Sonmezes' landlord—tenant dispute.[45] Parrish also attended a court hearing with Mrs. Sonmez on the matter, instructing Mrs. Sonmez to respond to questions and explaining that she, Parrish, need not talk at the hearing. Ultimately, following an unsuccessful attempt at mediation, the case was not resolved and, according to Mrs. Sonmez, she and her family were evicted shortly thereafter. As with the food stamps petition, Respondent did no work on the matter.

---

40. The People brought claims related to the Sonmez matters in case number 09PDJ064.

41. Ex. 83.

42. Ex. 68.

43. Ex. 81.

44. Exs. 37–38, & 43.

45. Exs. 48, 51, 53, & 58. Nevertheless, Parrish submitted billing statements to the Sonmezes on "DP Paralegal Services" letterhead. Ex. 80.

Unlike the other matters, Respondent drafted a fee agreement to memorialize his representation of the Sonmezes in the dog bite case.[46] Nevertheless, it was Parrish who drafted correspondence on the Sonmezes' behalf,[47] and it was Parrish who attended an animal control hearing with Mrs. Sonmez, who appeared before the judge while Parrish, sitting in the gallery, said nothing. Mrs. Sonmez testified that no further action was ever taken on the case; Respondent justified the inaction by claiming the Sonmezes failed to "bring anything in to support the case."[48]

On September 7, 2006, Parrish used Respondent's federal electronic case management ("ECM") log-in and password to file the Sonmezes' first Chapter 7 bankruptcy petition in case number 06–16165.[49] Parrish did not provide the Sonmezes an opportunity to review the petition, which included neither a certificate of credit counseling nor the Sonmezes' home address. Both were required by bankruptcy rules, as Kelly Sweeny ("Sweeny"), Chief Deputy Clerk for the United States Bankruptcy Court–District of Colorado, explained. The bankruptcy court dismissed the Sonmezes' petition on September 27, 2006, because the Sonmezes had failed to complete the required credit counseling class.[50]

Without informing the Sonmezes, Parrish filed on January 30, 2007, a second Chapter 7 bankruptcy petition on their behalf, using Respondent's personal ECM log-in and password.[51] On March 6, 2007, the bankruptcy trustee filed a report with the bankruptcy court, indicating that the Sonmezes' 2002 tax return had not been included with the petition and requesting the case be dismissed

unless that tax return was provided by March 19, 2007.[52] Nevertheless, Parrish wrote to the Sonmezes the next day to tell them their creditors' hearing was reset for April 4, 2007.[53] On March 20, 2007, the Sonmezes' second bankruptcy petition was dismissed because it had not been properly prepared and necessary documents had not been included.[54]

Parrish wrote a letter to the Sonmezes on Respondent's letterhead on March 26, 2007, to inform them the bankruptcy trustee had denied their second Chapter 7 bankruptcy petition.[55] Mrs. Sonmez said she did not see this letter until she retrieved her file and, in fact, she testified that Parrish called her shortly before the April 4, 2007, creditors' hearing to report the hearing date had changed.[56] Confused by the many date changes, the Sonmezes went to the courthouse on April 4, 2007, where they first discovered that two Chapter 7 bankruptcy petitions had been filed on their behalf and then dismissed for deficiencies.

The Sonmezes left the courthouse and placed telephone calls to Parrish, Respondent, and the receptionist at Respondent's firm, none of whom answered, so they drove directly to Respondent's office. While there, they recovered their file, which contained documents and correspondence that they never before had received, and they first learned Parrish was not a licensed attorney. Mrs. Sonmez said she was "very, very, very mad," and she penned a letter to Respondent, complaining about their "botched" bankruptcy. Respondent, in turn, signed a reply letter castigating the Sonmezes while evidencing a detailed understanding of their

46. Exs. 46 & 49. Mrs. Sonmez testified that there were two versions of the contingency agreement, one that she signed and Respondent retained, and one that her husband signed.

47. Ex. 44.

48. *See also* Respondent's Tr. Br. at 3 (noting the Sonmezes "had a duty to follow up with [Respondent] and provide him with information so that he could represent their daughter's interest. Never once did [the Sonmezes] provide [Respondent] with any information regarding their daughter's dog bite.").

49. Ex. 39.

50. Exs. 40, 42, & 47.

51. Ex. 50; Complaint ¶ 12; Answer ¶ 12.

52. Complaint ¶ 14; Answer ¶ 14.

53. Ex. 54.

54. Ex. 57; Complaint ¶ 16; Answer ¶ 16.

55. Ex. 59.

56. Ex. 74.

matters.[57] When Respondent failed to remedy matters, the Sonmezes brought a malpractice lawsuit against Parrish, Respondent, and his law firm.[58] Mrs. Sonmez testified that she also "looked all the time" at Respondent's website to see if Parrish had been fired, but Parrish "was always working there." [59]

■ The People allege Respondent violated several Rules of Professional Conduct with respect to his mishandling of the Sonmezes' matters, the most serious of which is Colo. RPC 5.5(b) (2007).[60] That rule prohibited lawyers from "assist[ing] a person who is not a member of the Colorado bar in the performance of an activity that constitutes the unauthorized practice of law." They also aver that by failing to exercise supervisory authority over Parrish, a non-lawyer, in order to ensure her conduct was compatible with Respondent's professional obligations, he flouted Colo. RPC 5.3(b) (2007).[61] Respondent disputes these claims on the grounds that he was unaware of Parrish's activities, portraying her as a "rogue paralegal" who acted on behalf of her own company, "DP Paralegal Services," of which he had

no knowledge. He also argues that he did supervise Parrish on cases in which he knew she was performing work, and he specifically highlights the Sonmezes' bankruptcy matter as one where Parrish "had gone off on her own." [62]

The Hearing Board finds clear and convincing evidence Respondent violated Colo. RPC 5.5(b) (2007) by facilitating Parrish's work on the dog bite case. Respondent cannot deny he was aware of the case—indeed, he himself signed the contingency fee agreement—yet he did no work on it, instead giving Parrish complete responsibility to advise the Sonmezes, advocate in writing on their behalf, attempt to negotiate for them a settlement, and attend a court hearing with them.[63]

We also conclude Respondent violated Colo. RPC 5.5(b) (2007) when he allowed Parrish, without a modicum of supervision, to counsel the Sonmezes concerning bankruptcy matters and file their bankruptcy petitions.[64] Respondent acknowledged that he never liked bankruptcy work and endeavored not to take on such cases,[65] yet he sent Parrish, at her behest, to take a test administered by

57. Ex. 60. The letter noted that "[t]here were far too many instances where Ms. Parrish advised you of what was needed, and ... the things you brought were either too late or not sufficient," that "Ms. Parrish made a number of attempts to counsel you concerning financial issues," and that "Ms. Parrish and this office wanted were desirous [sic] of assisting you and trying to guide you in a direction that would, indeed, make your lives better, legal and legitimate, a far cry from the way your business affairs have been conducted in the past, but it seems that was not acceptable." Respondent conceded his signature appears at the end of the letter but denied having written or read it, intimating that Parrish drafted the letter herself and obtained his signature on it without his review.

58. Exs. 65, 68–69.

59. Respondent reported to the People in September 2008 that he "immediately terminated" Parrish, but in February 2009, Respondent's firm letterhead still listed Parrish, Ex. 4, just as it did in late May 2009, even after a redesign of the letterhead block. Ex. 11. Parrish's name appears to have been dropped from the firm's letterhead by July 2009. Ex. 13.

60. The People plead this claim pursuant to the version of Colo. RPC 5.5(b) in effect between 1993 and January 1, 2008.

61. Colo. RPC 5.3(b) (2007) was effective between 1993 and January 1, 2008.

62. Respondent's Tr. Br. at 5.

63. See People v. Shell, 148 P.3d 162, 171 (Colo. 2006) (noting the unauthorized practice of law includes action as a representative to protect, enforce, or defend the legal rights of another, and counseling, advising, or assisting that person in connection with their legal rights and duties).

64. See People v. Reynolds, 933 P.2d 1295, 1298–99 (Colo.1997) (allowing a non-lawyer assistant to engage in the unauthorized practice of law is grounds for discipline); People v. Stewart, 892 P.2d 875, 877–78 (Colo.1995) (same).

65. See Complaint ¶ 3 ("According to Respondent, Parrish told him she was experienced in preparing bankruptcies. Respondent did not previously handle bankruptcies on a regular basis. Respondent specifically sent Parrish to bankruptcy training so she could work on the firm's bankruptcy cases. Respondent stated to the [People] that he believes she is competent to handle bankruptcy cases and that he does not like to do bankruptcies himself."); Answer ¶ 3 (admitting same).

the bankruptcy court in order to qualify for electronic filing status. Thereafter, as he testified, "she was responsible" for bankruptcy filings. Respondent allowed Parrish to use his ECM filing log-in and password, which, as Sweeny clarified, may only be issued to an attorney and is treated by the bankruptcy court as both the "wet signature" and certification of the filing attorney. Respondent also permitted Parrish to list her email as the sole electronic address to which all bankruptcy filings, notices, and court orders should be sent, even though he could have arranged for his email address to be listed alongside Parrish's. Finally, his April 2007 letter to the Sonmezes clearly reveals his awareness that Parrish was representing them in bankruptcy and his familiarity with her efforts on their behalf. As such, we cannot accept Respondent's claim that he lacked knowledge of Parrish's unauthorized practice of law,[66] nor can we concur that he did nothing to assist her activities.

■ The People have also proved Respondent violated Colo. RPC 5.3(b) (2007). As discussed above, we are persuaded Respondent knew about Parrish's significant involvement in the bankruptcy matter and the dog bite case yet failed to supervise her work to ensure it was compatible with his own professional obligations. Although Respondent could have done so, she never discussed the cases with Parrish, reviewed the file, called the bankruptcy court or the Sonmezes, or arranged to have bankruptcy notices and orders emailed to him directly. As regards the Sonmezes' landlord-tenant dispute and their food stamps petition, we conclude Respondent should have known, even if he did not,

that Parrish was working on these matters. Basic oversight and simple diligence surely would have yielded, at a minimum, an understanding of her activities as described in her several letters, which were all stored in the Sonmezes' file. Yet even if he had no inkling of Parrish's involvement with any of the Sonmezes' four matters, he nonetheless would have violated Colo. RPC 5.3(b) (2007) by inadequately supervising her work.[67]

■ We turn next to the People's allegations that Respondent violated Colo. RPC 1.1, 1.3, and 1.4(a) by failing to provide the Sonmezes competent representation, to act with reasonable diligence in representing them, and to keep them reasonably informed about their bankruptcy petitions, respectively. These claims are all founded on Respondent's neglect of the Sonmezes' bankruptcy case. With respect to each of these claims, Respondent contends he had no reason to believe he represented the Sonmezes in bankruptcy and thus had no duty to act with reasonable competence or diligence or to communicate with them concerning this matter.

The Hearing Board agrees with the People that Respondent turned his back on the Sonmezes in derogation of his duties of competence, diligence, and communication. In short, Respondent entrusted to Parrish his bankruptcy practice and therefore failed to review and correct Parrish's deficient filings for the Sonmezes, failed to monitor her use of his ECM log-in and password, and failed to keep the Sonmezes reasonably notified about the status of their matter, including the dismissal of their first bankruptcy petition and the filing of their second. Respon-

66. The People brought a petition against Parrish seeking to enjoin her unauthorized practice of law on June 2, 2009. Ex. 83. The PDJ takes judicial notice that the Colorado Supreme Court enjoined her from the unauthorized practice of law on September 15, 2009.

67. *See* Restatement (Third) of Law Governing Law § 11 (2011) ("Lack of awareness of misconduct by another person, either lawyer or nonlawyer, under a lawyer's supervision does not excuse a violation of this Section."); *State ex rel. Okla. Bar Ass'n v. Martin*, 240 P.3d 690, 699 (Okla. 2010) ("The record shows that respondent fell woefully short of his obligation to supervise a nonlawyer employee in the operation of a busi-

ness that provided legal support and research services under respondent's name and to make reasonable efforts to ensure that [the nonlawyer's] conduct was compatible with the respondent's professional obligations as a licensed practitioner. By his utter dereliction of duty respondent made the offense possible. He gave the offender a home from which to harm innocent people. While respondent may be an entirely innocent victim of a designing employee, that does not reduce his culpability in law one iota. He is vicariously liable in disciplinary responsibility for all the misdeeds of his unlicensed employee which went unnoticed until the victim complained.").

dent's neglect of this matter contravened Colo. RPC 1.1, 1.3, and 1.4(a).[68]

## IV. SANCTIONS

The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) ("ABA *Standards*") and Colorado Supreme Court case law govern the selection and imposition of sanctions for lawyer misconduct. ABA *Standard* 3.0 mandates that, in selecting the appropriate sanction, the Hearing Board consider the duty breached, Respondent's mental state, the injury or potential injury caused, and the aggravating and mitigating evidence.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* Respondent failed to fulfill his duties of loyalty and candor to his clients, the Weinhauers and Mayberry. As an officer of the court, he also acted in dereliction of his duty to the legal system by filing a false deed of trust, which seriously adversely reflects on his fitness to practice law.

In the Sonmez case, Respondent disregarded his duty to his clients to act with diligence and competence and to reasonably communicate with them by failing to supervise Parrish, thereby assisting her unauthorized practice of law, which constitutes a violation of a duty he owes as a legal professional.

*Mental State:* The Hearing Board concludes Respondent intentionally recorded the deed of trust against Mayberry's house with the conscious objective, as he admitted, "to secure the interest of Calvert & Company" in its loan to Mayberry, after which he sought to obtain an assignment of that deed of trust from the Weinhauers, deliberately failing to advise them of the perils of such a transaction in order to secure the deed's assignment. We also determine that Respondent, with conscious intent, attempted to enter into a prohibited business transaction with the Weinhauers by requesting that they assign the deed of trust to his company. Further,

we find Respondent purposefully loaned Mayberry money to gain equity in her home. Indeed, we credit Mayberry's testimony that "[Respondent] was aware of my mental state, he knew I was abusing substances, drugs . . . he saw me coming. If I didn't have my home free and clear, he wouldn't have paid attention to me at all. . . . [He] took advantage of a person [who] was not stable." As Desiree Mayberry testified, "[Respondent] saw Mom as a sucker."

The Hearing Board finds Respondent knowingly created a conflict of interest between the Weinhauers and Mayberry when he concurrently represented both parties yet recorded the deed of trust, which placed them in a posture directly adverse to one another. We also conclude Respondent knowingly failed to inform Mr. Weinhauer of his stop payment orders on the two checks written to cover unpaid medical bills and thereby knowingly misrepresented that those two bills had been paid.

With respect to the Sonmez matters, we conclude Respondent knowingly assisted Parrish in the unauthorized practice of law and knowingly failed to exercise supervisory authority to ensure her conduct was congruent with his professional responsibilities. As such, we also determine Respondent knowingly failed to provide the Sonmezes with competent and diligent representation and knowingly disregarded his duty to communicate with them.

*Injury:* Respondent's misconduct has injured the Weinhauers. As an initial matter, they feel he betrayed them: Mrs. Weinhauer testified, "I gave to him all my trust because he is a lawyer with experience. He is supposed to protect us, but he didn't." Indeed, she suspects Respondent "targeted" her for involvement in the deed of trust transaction because of her immigrant status, noting, "I feel like [he] chose me." Mrs. Weinhauer and Weinhauer–Howe testified they also worry about reputational harm due to their involvement in this "mess"; they complained he had "dirtied" their family name, which is highly valued in the Czech community.

---

68. *See* Restatement (Third) of Law Governing Law § 11 (noting that failure to supervise "may in an appropriate instance constitute a violation of the duty of care that the individual lawyer with supervisory responsibility owes to a firm client").

Weinhauer–Howe also noted her parents were still receiving calls from collection agencies for unpaid medical bills.

Most distressing to the Weinhauers, however, is the knowledge that without their consent, Respondent knit them together in a transaction with Mayberry, which Mr. Weinhauer testified has "caused a lot of stress." While testifying, Mrs. Weinhauer worried that Mayberry has her personal contact information and wondered, "maybe she will come to my house with a gun and shoot my family?" [69] Mr. Weinhauer said he fears that Mayberry, her daughter, or Respondent will sue them for $84,000.00, as Respondent's June 2010 letter threatens.[70] Indeed, we find this threat of suit to constitute a potentially serious injury. Finally, the Weinhauers testified they are anxious about remedying the situation; they want to invalidate the deed of trust, but they neither trust Respondent to do so nor wish to pay another attorney to perform that task. In short, Mrs. Weinhauer testified that she does not feel she can live her life "in peace."

In a similar vein, Respondent has caused Mayberry serious harm. He clouded the title to her house without her knowledge while enabling her addiction. Only within the past year has she realized that Respondent put her in a situation where her house might be taken away from her. Mayberry testified that she sees Respondent as a "father figure" who took advantage of her and "crossed" her, and she noted she has twice attempted suicide since learning about the deed of trust. Desiree Mayberry affirmed that her mother's threats of suicide have become more frequent because, when clean, her mother "sees what she's done, and she hates herself for it."

Likewise, Respondent's failure to supervise Parrish has seriously harmed the Sonmezes, since Parrish severely prejudiced their interests by repeatedly filing bankruptcy petitions on their behalf.[71] As Sweeny explained, bankruptcy rules confer an automatic stay on all collection actions for a first-time bankruptcy filer pending resolution of the bankruptcy petition. However, if a petitioner's case has been dismissed within the preceding year, the automatic stay provision lasts only thirty days. And if two cases have been dismissed within a calendar year—as were the Sonmezes'—no automatic stay protections apply in a third-filed case. Sweeny also testified that Respondent's misconduct cost the Sonmezes $299.00 in lost filing fees for each petition.

The Sonmezes, too, testified to the injury they have suffered as a result of Respondent's lack of oversight. On the day they visited the courthouse, the Sonmezes experienced significant stress. "It was the worst day of my life," Mrs. Sonmez said. She said she wondered if they were "going to go to jail," and she felt "very lost," as if she had done "something wrong by seeking an attorney's help." Further, because they have now filed three bankruptcy petitions, she fears that the bankruptcy court regards them as "habitual filers." Their poor credit has forced them to pay excessive interest rates, if they can secure loans at all. They were evicted from their apartment following Parrish's failure to resolve the dispute with their landlord, and their business suffered for three years after Parrish neglected to work on the food stamps issue. Their business troubles also occasioned marital problems, and the Sonmezes separated for a while. Mrs. Sonmez testified, "In my culture, the man is the pillar of the house. If he cannot support us then everything crumbles. With his business in jeopardy, everything fell apart." Mrs. Sonmez also testified that her husband initially blamed her, rather than Respondent or Parrish, for the difficulties in resolving their legal matters, which had been a significant factor in their separation.

---

69. Mrs. Weinhauer began to fear for her family's safety upon researching Mayberry's criminal record. *See* Ex. 22.

70. Ex. 97.

71. Respondent admitted in his answer that his "conduct, in failing to adequately supervise Parrish, caused serious or potentially serious injury" to the Sonmezes, Complaint ¶ 51; Answer ¶ 1. We do not rely on that confession, however, since Respondent now contests the admission. Rather, we independently find that Respondent's misconduct seriously injured the Sonmezes based solely on the testimony and evidence before us.

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

Aggravating circumstances are any factors that may justify an increase in the degree of discipline to be imposed, and mitigating circumstances are any considerations or factors that may justify a reduction in the severity of the sanction. The Hearing Board considers evidence of the following aggravating and mitigating circumstances in determining the appropriate sanction.

*Disciplinary Record—9.22(a)/9.32(m):* Respondent received two letters of admonition in 1977, and one each in 1980, 1982, 1992, and 1995. He also received a public censure in 1980 for conduct involving conflicts of interest. He was placed on suspension for twelve months in 1986 for commingling client funds in his trust account and was again suspended for twelve months in 1996 when he neglected two client matters. Respondent argues that these nine prior instances of misconduct are too outdated and too dissimilar to the matter at hand to be considered in aggravation, and he requests we apply the counterbalancing mitigator of remoteness of these prior offenses. Although we agree many of these prior offenses do not warrant consideration, given their remoteness in time, we do weigh as a factor in aggravation Respondent's public censure in 1980, which the Colorado Supreme Court described as "stemming from a serious and blatant conflict of interest." [72] We also pause to express our concern that, even over the course of a forty-nine-year career, Respondent has been disciplined on nine occasions.

*Dishonest or Selfish Motive—9.22(b)/ 9.32(b):* The People press the Hearing Board to find Respondent acted with a dishonest and selfish motive in the Weinhauer and Mayberry matters, while Respondent contends he acted in a spirit of generosity with the intent to help others in need. As dis-cussed above, we do not hesitate to find Respondent's motive was both dishonest and selfish.[73] Respondent recorded a false deed of trust and then sought to arrange assignment of that instrument to Calvert & Company in order to secure his own financial interests in the loans he made to Mayberry. He also loaned Mayberry money in order to secure equity in her home, which, as Desiree Mayberry postulated, he planned to take from Mayberry "like candy from a baby."

We likewise find Respondent's selfish motive is evidenced by his attempt to extract from the Weinhauers additional money when retracting his earlier agreement to reduce his fee by ten percent. Respondent's change of heart—well after the settlement was finalized—transformed his initial fee reduction into nothing more than a Barmecide feast. That he demanded this money after the Weinhauers refused to accede to his demand to assign the deed of trust and after they filed a disciplinary complaint against him only strengthens our view that Respondent was motivated by his own self-serving interests.

The People also request application of this aggravating factor in the Sonmez case, arguing Respondent was fueled by a selfish motive to turn over to Parrish all of the privileges afforded to him by his law license—including the prestige of his law office and his federal bankruptcy court log-in and password—thus allowing him to expand his practice to encompass bankruptcy work and earn additional income. Respondent contends he at no time demonstrated a dishonest or selfish motive in this matter. The Hearing Board agrees with the People and determines Respondent was selfishly motivated when he completely abdicated his responsibility to supervise Parrish's work.

*Pattern of Misconduct—9.22(c):* Respondent's pattern of dishonesty and self-dealing

---

**72.** *People v. Calvert*, 721 P.2d 1189, 1191 (Colo. 1986).

**73.** The Hearing Board also is concerned about the self-centered, dishonest behavior Respondent displayed in this disciplinary proceeding. In his answer, Respondent admitted that "his conduct, in failing to adequately supervise Parrish, caused serious or potentially serious injury" to the Son-mezes. However, Respondent now contests this admission. Additionally, Respondent's disciplinary record confirms that he has been disciplined on nine prior occasions. At the hearing, Respondent testified that he had been disciplined just twice, and in Respondent's closing argument, he admitted to having been disciplined only on five occasions.

manifested in the Mayberry and Weinhauer matters over the course of several years. We consider this a factor in aggravation.

*Multiple Offenses—9.22(d):* Respondent engaged in multiple types of misconduct involving three separate clients, including recording a false instrument, attempting to engage in a self-interested business transaction, making false representations, and assisting a non-lawyer in activities that constitute the unauthorized practice of law.

*Obstruction of or Cooperation in the Disciplinary Process—9.22(e)/9.32(e):* The People argue Respondent engaged in bad faith obstruction of this proceeding by denying a number of allegations in his answer to which he then admitted during discovery or the disciplinary hearing, adding to the time and costs of the proceeding. Respondent maintains he was cooperative in all aspects of the disciplinary process. Because the Hearing Board heard no evidence substantiating either position, we apply neither ABA *Standard* 9.22(e) nor ABA *Standard* 9.32(e).

*Refusal to Acknowledge Wrongful Nature of Conduct or Demonstration of Remorse—9.22(g)/9.32(l):* The People argue Respondent has failed to take any steps to clear Mayberry's title or protect the Weinhauers from legal action by Mayberry. They also assert he has neglected to refund to the Sonmezes any bankruptcy fees and has disclaimed responsibility for Parrish's actions. Respondent, on the other hand, insists he is remorseful. He expresses a willingness to make restitution in the Sonmez matter. He also acknowledges that he should not have recorded the deed of trust without the Weinhauers' "direct consent" and that he should have provided written disclosures when in doubt. Nevertheless, he maintains that "nothing [he] did in this matter rose above the level of excusable neglect or negligence."[74] In light of this position, we accord no weight to the mitigating factor of remorse, and we heavily weigh, in aggravation, Respondent's refusal to acknowledge his many intentional acts of misconduct in the Mayberry and Weinhauer matters.[75]

So, too, with the Sonmez representation: Respondent's April 2007 letter chiding the Sonmezes and defending Parrish[76] speaks volumes, and we accordingly apply ABA *Standard* 9.22(g) as an aggravating factor in that matter.

*Vulnerability of the Victims—9.22(h):* The People observe that the Sonmezes and Weinhauers are immigrants for whom English is a second language and that Mayberry suffers from a long-standing substance abuse problem. They People therefore argue that all of these clients should be viewed as vulnerable victims. Respondent disagrees. He argues that the Weinhauers are a close-knit family who make decisions together; that the Sonmezes are "sophisticated" businespeople fluent in English; and that Mayberry was not forthcoming about her substance abuse. The Hearing Board finds Mayberry is the epitome of a vulnerable victim: she suffers from mental illness and a severe chemical dependency, both of which significantly impair her judgment. To a lesser extent, we also find the Weinhauers and Sonmezes were vulnerable to Respondent's misconduct. They do not speak English as their first language, which, when compounded with their lack of familiarity with legal proceedings in this country, places them in a vulnerable position. Indeed, Mrs. Weinhauer suspects Respondent targeted her family because of their lack of sophistication and discomfort with the English language.

*Substantial Experience in the Practice of Law—9.22(i):* Respondent was licensed to practice law in 1962. His conduct ill befits an attorney licensed in this jurisdiction for almost fifty years, and we consider his substantial experience as an attorney to be an aggravating factor.

*Character or Reputation—9.32(g):* Respondent called three witnesses to testify to his character and reputation. James Reitz, a neighbor of Respondent's daughter, de-

---

**74.** Respondent's Am. Closing Arg. at 17.

**75.** *See People v. Rudman,* 948 P.2d 1022, 1027 (Colo.1997) (according no weight to mitigating factor of remorse when finding that, "[w]hile the respondent *expressed* remorse ... he steadfastly refused to see any misconduct whatsoever....").

**76.** Ex. 60.

scribed Respondent as a "10 out of 10 in terms of honesty and integrity" and noted he would hire Respondent if he required legal counsel. Yetty Yhin, a former client, testified that she was very satisfied with Respondent's representation and the care she received from his whole team. She praised him as a "very understanding, very prayerful, very honest person," and she noted that she has referred other people to him for legal work. Michelle Rahn ("Rahn"), former Ms. Senior America, also testified for Respondent as a character witness. Rahn met Respondent when she competed against his wife for the title of Ms. Senior Colorado. She extolled Respondent's "acts of generosity," and she characterized him as "honest to the core" and "a man of integrity." Finally, Respondent submitted to the Hearing Board a letter of reference written by Leonard M. Chesler, Esq., who commends Respondent as "a religious, God-fearing, consummate gentleman who perhaps places too much good faith and trust in those around him...."[77] Respondent also asks us to consider that he is a former United States Air Force pilot, regularly takes pro bono cases, and has held a spate of active leadership positions in his church. We consider this factor in mitigation.

## Sanctions Analysis Under ABA Standards and Case Law

The starting point in our sanctions analysis regarding the Weinhauer and Mayberry matters is ABA *Standard* 5.11(b), which provides that disbarment is appropriate when a lawyer engages in intentional conduct involving dishonesty, fraud, or deceit that seriously adversely reflects on the lawyer's fitness to practice law. A corollary is ABA *Standard* 6.11, which calls for disbarment when a lawyer, with the intent to deceive a court, submits a false document, resulting in serious or potentially serious injury to a party. And ABA *Standard* 4.61 also recommends disbarment when a lawyer knowingly deceives a client with the intent to benefit the lawyer, thereby causing serious

or potentially serious injury. These *Standards,* when taken together, indicate that disbarment is the presumptive sanction here for Respondent's intentional recording of the false deed of trust, which seriously injured Mayberry and threatened the Weinhauers with grave potential injury.

Similarly, ABA *Standard* 4.31 lists disbarment as the presumptive sanction when a lawyer engages in the representation of a client, while knowing the lawyer has interests adverse to the client's, with the intent to benefit the lawyer and resulting in serious or potentially serious injury to the client. That same *Standard* provides that disbarment is also appropriate when a lawyer simultaneously represents clients whom the lawyer knows have adverse interests, with the intent to benefit the lawyer, which seriously or potentially seriously harms those clients. The Hearing Board reads these *Standards* to approve disbarment here, where Respondent, intending to benefit himself, urged the Weinhauers to assign the deed of trust to Calvert & Company without their informed consent. We also construe these *Standards* to recommend disbarment for Respondent's simultaneous representation of Mayberry and the Weinhauers, parties who assumed directly adverse interests after Respondent recorded the deed of trust.

Applicable case law indicates sanctions in somewhat similar cases have ranged from a three-year suspension, as the People request, to disbarment. In *People v. Rudman,* an attorney was suspended for three years for making misrepresentations to the sole beneficiary of an estate, for which the lawyer acted as personal representative, in an effort to keep the deceased's assets for himself and increase his legal fees.[78] The Colorado Supreme Court noted that such conduct, by itself, could warrant disbarment, but it ultimately found a lengthy suspension was sufficient when considering mitigating factors, including the attorney's lack of prior

---

77. Respondent's Am. Closing Arg. Ex. A. Mr. Chesler also compliments Respondent's decision to retain Mr. Casey to represent him in this disciplinary hearing.

78. 948 P.2d at 1027.

discipline.[79] However, the Colorado Supreme Court ordered disbarment in *People v. Vigil*.[80] There, among other things, the attorney represented a client with an interest directly adverse to his trustee (to whom he served as conservator), engaged in business transactions with his trustee for his and his family's benefit, neglected legal matters entrusted to him, and engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation.[81] The plethora of aggravating factors, including a history of prior discipline, a dishonest or selfish motive, a pattern of misconduct, multiple offenses, obstruction of the disciplinary process, substantial experience in the practice of law, and lack of remorse, all reinforced the Colorado Supreme Court's conclusion that disbarment was warranted.[82]

More factually analogous to the case at hand are two cases from sister jurisdictions. In the first, *Attorney Grievance Commission of Maryland v. Coppola*, the Maryland Court of Appeals disbarred an attorney after family members of an unconscious woman beseeched the attorney to assist them in forging her signature on estate-planning documents.[83] The attorney proceeded to notarize a falsely executed will, trust, deed, and durable power of attorney; directed two of his employees to falsely attest that they witnessed execution of these instruments; and instructed his employee to record the falsely executed deed.[84] Notwithstanding that the attorney's actions were mitigated by his cooperation with the disciplinary proceedings to "an exceptional degree," an absence of a selfish motive, his lack of premeditation, his impulse to help a family in distress, his lack of prior discipline, his good character, the fact that the incident was an aberration, his sincere efforts to rectify and mitigate the effects of his misconduct, the penalties he incurred beyond those in the disciplinary proceedings, and his efforts at rehabilitation, the Maryland court concluded disbarment was necessary.[85]

The second case, *In re Easler*, addressed an attorney's misconduct in persuading a client, who was "in the throes of domestic and financial difficulties," to sell at an undervalued price the client's interest in land to a "straw man." [86] After the attorney paid the purchase price, he prepared falsified instruments to consummate the property's transfer, through the straw man, to the attorney's mother.[87] Further, the attorney falsely notarized the "bogus signature" of his client and allowed others in his office to sign his name to various papers and documents filed with the courts and as notary.[88] The South Carolina Supreme Court held that the attorney deliberately defrauded his client and attempted to acquire the property for his personal gain, warranting disbarment.[89]

With regard to Respondent's misconduct in the Sonmez matter, we look to ABA *Standard* 7.1, which identifies disbarment as the appropriate sanction when a lawyer knowingly engages in conduct that violates a professional duty with the intent to obtain a personal benefit, causing serious or potentially serious injury to a client. ABA *Standard*

79. *Id.; see also People v. DeRose*, 945 P.2d 412, 413–15 (Colo.1997) (suspending an attorney for three years for investing client funds for the benefit of his friends and relatives on multiple occasions, coupled with neglect of some legal matters and failure to prepare for others, but finding disbarment unnecessary because certain mitigating factors were present, including absence of a dishonest or selfish motive, good character and reputation, and demonstrated remorse); *People v. Banman*, 901 P.2d 469, 471 (Colo.1995) (suspending an attorney for three years for charging excessive fees, failing to provide appropriate accountings, entering into business transactions with his clients without revealing conflicts of interest, and handling legal and investment matters without the requisite experience, where the attorney had no prior discipline).

80. 929 P.2d 1311 (Colo.1996).

81. *Id.* at 1312–14.

82. *Id.* at 1315.

83. 19 A.3d 431, 437–38 (Md.2011).

84. *Id.* at 439–40.

85. *Id.* at 447–55.

86. 275 S.C. 269, 269 S.E.2d 765, 765–66 (1980).

87. *Id.* at 766.

88. *Id.*

89. *Id.*

7.2, in contrast, calls for suspension in cases where a lawyer knowingly engages in conduct that violates a professional duty, thereby causing injury or potential injury. Because we find Respondent seriously injured the Sonmezes by knowingly disregarding his duty to supervise Parrish, a non-lawyer—even while he armed Parrish with his ECM log-in and password to file pleadings in bankruptcy cases—we conclude that ABA *Standard* 7.1 is the applicable sanction for Respondent's misconduct.

This presumption of disbarment is buttressed by the holding in *In re Felker*.[90] In that case, the attorney permitted a non-lawyer to render ineffective and harmful legal advice to her client.[91] The attorney also failed to sufficiently prepare for a case, neglected legal matters, lied to a client about the cancellation of a hearing, failed to provide adequate notice of her intent to withdraw from clients' cases when she abandoned her legal practice, and failed to return clients' files.[92] Pointing to ABA *Standard* 7.0, the Colorado Supreme Court noted that the attorney reaped some financial benefit from the non-lawyer's provision of legal services.[93] And the court concluded that while the ABA *Standards* did not suggest disbarment for the remaining charges, the "addition of these perhaps less serious infractions only reinforces our conclusion that the respondent's conduct reflects a pattern of disregard for both her clients' needs and the standards of conduct that govern members of the legal profession."[94] The Colorado Supreme Court therefore disbarred the attorney.

We also find support in *People v. Stewart*, where an attorney was suspended for three years for making unauthorized charges to her law firm's credit card, aiding a non-lawyer in the unauthorized practice of law, and neglecting clients' legal matters after her non-lawyer assistant secured retainers from those clients.[95] Unlike in this case, numerous mitigating factors were present in *Stewart*; most salient, the attorney was afflicted with a mental disorder that caused the misconduct, and therefore the court concluded disbarment was too severe a sanction.[96]

Taking all these authorities together, in conjunction with the ABA *Standards'* directive that the ultimate sanction imposed "should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations [but] might well be and generally should be greater than the sanction for the most serious misconduct,"[97] we conclude disbarment is the appropriate sanction in this case. Further, the overwhelming balance of aggravating circumstances, measured against just two factors in mitigation, bolsters our finding. A less severe sanction would undermine the seriousness of Respondent's wrongdoing in the eyes of both the profession and the public, and the Hearing Board is therefore confident that Respondent's misconduct justifies disbarment.

## V. *CONCLUSION*

Respondent's dishonesty strikes at the heart of our system of justice, and his self-dealing and assistance of a non-lawyer in her unauthorized practice of law have no place in the legal profession, the great strength of which lies in the honor and integrity of its practitioners. The Hearing Board thus concludes Respondent's many acts of professional misconduct call for disbarment.

## VI. *ORDER*

The Hearing Board therefore **ORDERS**:

1. **DAVID ROSS CALVERT**, attorney registration number 01828, is **DISBARRED**. The **DISBARMENT SHALL** take effect only upon issuance

---

90. 770 P.2d 402 (Colo.1989).

91. *Id.* at 406–07.

92. *Id.* at 403–06.

93. *Id.* at 407.

94. *Id.*

95. 892 P.2d at 876–77.

96. *Id.* at 878–79.

97. ABA *Standards* Theoretical Framework, § 2 at 7.

of an "Order and Notice of Disbarment." [98]

2. Respondent **SHALL** file any post-hearing motion or application for stay pending appeal with the PDJ **on or before Tuesday, October 25, 2011.** No extensions of time will be granted. If Respondent files a post-hearing motion or an application for stay pending appeal, the People **SHALL** file any response thereto within five days, unless otherwise ordered by the PDJ.

3. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** submit a "Statement of Costs" within fifteen days from the date of this order.

4. As requested by the People, Respondent **SHALL** pay restitution. In the People's "Statement of Costs," the People therefore **SHALL** state the amount and the recipient of each restitution award they seek, including, if applicable, monies expended to satisfy Mr. Weinhauer's two medical bills, any attorney's fees incurred to release the deed of trust on Mayberry's house, and any bankruptcy fees associated with the Sonmezes' bankruptcy petitions. Respondent must submit any response to the People's statement within ten days. Thereafter, the PDJ will issue an order ruling on the People's request.

5. Respondent **SHALL** promptly comply with C.R.C.P. 251.28(a)—(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation. Respondent also **SHALL** file with the PDJ, within ten days of the issuance of the "Order and Notice of Disbarment," an affidavit complying with C.R.C.P. 251.28(d).

---

98. In general, an order and notice of sanction will issue thirty-one days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-one days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.